No. 25-11296

---

IN THE UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT

---

*Joy Laskar, Ph.D., Plaintiff-Appellant,*
v.
*Phillip W. Hurd and Patrick A. Jenkins,*
*Defendants-Appellees*

---

On Appeal from
the United States District Court
for the Northern District of Georgia
Atlanta Division
Case No. 1:18-cv-04570-WMR

---

**OPENING BRIEF OF PLAINTIFF-APPELLANT**

---

Michael Alan Dailey
ANDERSON DAILEY LLP
1880 Dinsmore Road
Milton, Georgia 30004
770 827 6510

Craig A. Gillen
GILLEN & LAKE LLC
400 Galleria Parkway, Suite 1920
Atlanta, Georgia 30339
404 842 9700

*Counsel for Plaintiff-Appellant*

**No. 25-11296**

**Joy Laskar Ph.D. v. Phillip W. Hurd et al.**

## Certificate of Interested Persons and Corporate Disclosure Statement

Carr, Christopher Michael; Attorney General, State of Georgia, Attorney for Appellees;

Chalmers, Roger A.; Attorney for Appellees;

Dailey, Michael Alan; Attorney for Appellant;

Georgia Institute of Technology (and Georgia Tech Research Corporation);

Gillen, Craig A.; Attorney for Appellant;

Hurd, Phillip W.; Appellee;

Jenkins, Patrick A.; Appellee;

Kang, Jason H.; Attorney for Appellees;

Laskar, Joy; Appellant;

Peters, William; Attorney for Appellees;

Shapiro, Robert B.; Attorney for Appellees;

State of Georgia;

The Honorable William M. Ray II, Judge, U.S. District Court (N.D. Ga.)

Plaintiff-Appellant is an individual and does not have a parent corporation. Plaintiff-Appellant is not a publicly held corporation.

## Statement Regarding Oral Argument

Oral argument is warranted in this case because it presents the Court with an opportunity to evaluate the District Court's remarkable conclusion below, that professional audit investigators, employed by the Georgia Institute of Technology, and ultimately accountable to their own institutional President and to the Chief Audit Executive for the University System of Georgia, and possessing a variety of professional certifications and competencies, secured for the purpose of expanding their investigative prowess and to ensure that they can perform their jobs as professionally as possible, should not "be subject to the same constitutional guiderails as law enforcement officials." [Doc. 120, p. 21]. "Although Defendants may have participated in certain stages of, and assisted with and participating in stages of an investigation, it does not logically follow that they ought to be subject to the same constitutional guiderails as law enforcement officials." [Doc. 120, p. 21].

This conclusion is notable because one of the two Appellees in this case, serving as a member of the Georgia Tech Audit team, and focusing on IT Systems and computer-based discovery, who also participated in the questioning of a long series of deposition deponents and interview interviewees in this investigation, made a significant admission during the course of his own deposition testimony.

He testified that it was "a good question" if seeking to learn information about the conduct and activities of Appellant and his faculty startup company would be assisted if the scope of the investigation had been broadened to include the conduct and activities of other faculty and faculty startup companies so that a judgment could be made whether the perceived use of funds by Appellant and the commission of other investigated steps was comparable to or in contrast with what other faculty and their companies were doing. Appellee Jenkins expressed his own view that the scope of the investigation which his team was pursuing could have and should have been broadened to include a comparison of what other faculty and their startup companies were doing. He offered only one reservation, and that was to do so would involve a "different audit" than the one they were performing. Broadening the investigation, he explained, would require more time, task already limited personnel. [Doc. 104/104-1, Jenkins Dep, pp. 138-140 of 459].

This testimony, Appellant respectfully submits, provides direct evidence in support of Appellant's contentions in this case that the investigation and findings leading to a criminal proceeding against Appellant involved false, misleading and materially incomplete investigative information. It gives rise to intentionally false information being permitted to permeate the investigative findings because no effort at all is being made to test whether the conclusions respecting Appellant are

flawed, false, and/or demonstrative of a reckless disregard for the truth.

Now, and in the face of longstanding case authorities which hold that other officials apart from those who actually make application for an arrest warrant, and who have provided false, misleading and materially incomplete information which leads to or instigates a criminal proceeding, that they, too, can become liable for a *Fourth Amendment* malicious prosecution claim. The case law provides that an officer who secures an arrest warrant without probable cause is liable for all foreseeable injuries flowing from the officer's initial act, regardless of further involvement. *Whiting v. Traylor,* 85 F.3d 581, 585 (11th Cir. 1996) (holding that the suspect may sue for "injuries caused by the unlawful seizure [,which] may include those associated with the prosecution"); *see also Malley v. Briggs,* 475 U.S. 335, 345, 106 S. Ct. 1092, 1098, 89 L.ED. 2d 271 (1986). (holding that *§ 1983* liability is premised on holding people responsible for the natural consequences of their actions and that liability for the consequences of an arrest flow naturally from filing an affidavit).

Appellant respectfully requests oral argument.

## Table Of Contents

**Page**

Certificate of Interested Persons and Corporate Disclosure Statement ......... C-1

Statement Regarding Oral Argument ............................................... i

Table of Contents .................................................................. v

Table of Citations ...................................................................

Jurisdictional Statement ........................................................ vi

Statement of the Issues .......................................................... 1

Statement of the Case ............................................................ 2

Summary of the Argument ....................................................... 8

Standard of Review ................................................................ 9

Argument ..............................................................................10

I. Appellant Is Able To Prove A Malicious Prosecution Claim .........10

A. The Record Presents A Genuine Dispute of Material Fact As To Whether Dr. Laskar's Pretrial Detention Was Unlawful...10

1. The Any-Crime Rule Does Not Apply To Malicious Prosecution...................................................... 11

2. Having Established The Inapplicability of the Any-Crime Rule, Appellant Must Prove That The Judicial Determination of Probable Cause Underlying The Seizure Was Unlawful 14.

3. Dr. Laskar Has Established a Genuine Issue of Material Fact Respecting Whether He Suffered an Unconstitutional Seizure Pursuant to Legal Process......................... 15

4. Special Agent Lisa Vorrasi should have known that the Afidavits For Arrest failed to Establish Probable Cause........................ 16

5. An Attempt is made to Rehabilitate the Lack of Probable Cause in the Affidavits For Arrest through the presentation of Agent Vorrasi's Declaration.......................... 19

6. An after-the-fact effort to show probable cause Is being attempted through the Declaration of David McLaughlin............................... 23

7. Appellant can demonstrate the constitutional infirmity of his seizure by showing that Appellees recklessly made misstatements or omissions necessary to support the warrant... 25

II. Appellees are not entitled to summary judgment based on qualified immunity as there are genuine issues of material fact respecting whether the investigative methodology and the investigative findings delivered to law enforcement were insufficient to establish probable cause. The district court was in error when it concluded that the Appellees were "at most 'merely negligent'" in their disregard for the truth. .......................................52.

III. In light of Appellee Jenkins's admission, and the failure of Appellees to broaden their investigative scope, Appellees have acted with actual malice toward Appellant or with a wilful and conscious disregard of consequences. ..........................................52

Conclusion ............................................................... 53

Certificate of Compliance ....................................................... 54

Certificate of Service ............................................................ 55

## Jurisdictional Statement

Appellant respectfully shows the Court the following:

(1) Appellant's Complaint and First Amended Complaint were filed on September 28, 2018 and November 18, 2018, respectively. Each pleading stated claims brought pursuant to (a) *42 U.S.C. §§ 1983 and 1988*, (b) the *Fourth Amendment* to the Constitution of the United States, and (c) principles of Georgia law pertaining to the claim of malicious prosecution. The District Court possessed subject-matter jurisdiction to address Appellant's claims pursuant to *28 U.S.C. § 1331*, which provides "The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws or treaties of the United States." Appellant's claims arose from the Appellees' issuance and presentation to law enforcement and others on April 14, 2010 of an Official Report of Suspected Malfeasance respecting Appellant, from which a warrant arrest of Appellant occurred on September 24, 2010 and a criminal prosecution of Appellant was commenced by means of grand jury indictment on December 30, 2014. Thereafter, on October 5, 2016, all claims which had been filed and presented against Appellant were dismissed and terminated in their entirety by the Superior Court Judge of Fulton County, Georgia assigned to consider them. (Doc. 1, ¶¶

1, 13, 189, 190); (Doc. 19, ¶¶ 1, 13, 189, 190, 192-205); (Vorrasi Dep., Doc. 109; Exh. 64), (Laskar Aff., Doc. 97-1, ¶53);

(2) The jurisdiction of the Court of Appeals is established pursuant to *28 U.S.C. § 1291,* which provides "Federal appellate jurisdiction is established to address final decisions of the district courts." A final decision in this case was rendered by the United States District Court for the Northern District of Georgia, Atlanta Division (The Honorable William M. Ray II) when on March 14, 2025 an Order was entered granting summary judgment to Defendants-Appellees, announcing the case "DISMISSED," and ordering the Clerk "to close the case." (Doc. 120, p. 22). Three days later, on March 17, 2025, a final Judgment was entered in the case, again announcing the action as "dismissed." (Doc. 121, p. 1). Within 30 days of the entry of the Order and ensuing Judgment, on April 11, 2025, Appellant filed a Notice of Appeal, specifically referencing that he was appealing to the Eleventh Circuit Court of Appeals respecting both the Order and Judgment;

(3) The filing dates establishing the timeliness of this appeal are set forth in part (2) above; see also *28 U.S.C. § 2107(a)*; and

(4) The subject appeal is from a final Order and ensuing Judgment disposing of all parties' claims.



.

## Statement of the Issues

**I.** Whether state officials in a *§ 1983 Fourth Amendment* malicious prosecution suit were entitled to summary judgment based on qualified immunity when there were disputed issues of material fact regarding the existence of probable cause for the arrest and seizure of Appellant.

Relatedly, whether the testimonial admission of Appellee Patrick Jenkins that the scope of the investigation pursued by Appellees respecting Appellant and his company should have been expanded to encompass the actions of other faculty and faculty startup companies at the Georgia Institute of Technology's School of Electrical and Computer Engineering. A related issue is whether the aforementioned admission has created genuine issues of material fact respecting probable cause and qualified immunity in that the investigation's methodology and findings were reflective of a selective investigation and an intentional and reckless disregard of the truth when making investigative findings.

**II.** Whether the District Court was correct in concluding that when pursuing an intentionally limited investigation the Appellees were "at most 'merely negligent'" in their disregard of the truth.

Relatedly, whether Appellees, in pursuing an intentionally limited investigation of Appellant and his startup company, acted with actual

malice toward Appellant, and with wanton and wilful disregard for the consequences of their actions.

## Statement Of The Case

### I. Course of Proceedings And Dispositions In The Court Below.

#### A. Defendants' Motions To Dismiss.

On September 28, 2018 Appellant filed a Complaint against Appellees in the United States District Court for the Northern District of Georgia, Atlanta Division, alleging a *Fourth Amendment* malicious prosecution claim pursuant to *42 U.S.C. § 1983.* (Doc. 1). On November 7, 2018 the Defendants-Appellees filed a FRCP 12(b)(6) motion to dismiss the Complaint. (Doc. 14). On November 28, 2018, Dr. Laskar filed a First Amended Complaint. (Doc. 19). On December 10, 2018, the Defendants-Appellees filed a second motion to dismiss. (Doc. 21). In both filed motions Appellees asserted that Dr. Laskar had failed to plead an essential element to his claim – that the criminal prosecution against him had been terminated in his favor with an "indication of [his] innocence." (*Id.*) Dr. Laskar simply pleaded that the criminal proceeding had been terminated finally and in his favor, [Doc. 1, ¶190 and Doc. 19, ¶¶190-205), Appellees insisted the omission of any suggestion of innocence meant that the dismissal could not be considered a favorable termination for malicious prosecution purposes. [Doc. 21, p. 2].

Appellant responded that a showing of an “indication of innocence” was not required; only that his case had been fully and finally terminated without his having made an admission of guilt or suffered a conviction. See *Hammock v. Wal-Mart Stores, LP*, 2012 U.S. Dist. LEXIS 191773 (N.D. Ga. July 26, 2012); [Doc. 24 p. 10].

On April 3, 2019 the district court entered an order granting the Appellees’ motion to dismiss. [Doc.30]. On May 1, 2019, Appellant filed a timely Notice of Appeal. [Doc. 33].

The appeal was taken to this Court, and on August 28, 2020 a three-judge panel led by Chief Judge William Pryor affirmed in part, reversed in part,and remanded the case to the district court for further proceedings consistent with its order. [Doc. 38]. The district court’s order was affirmed in part to uphold the dismissal of two originally named defendants, Jilda D. Garton and Mark G. Allen, who had had no direct interaction with law enforcement. The district court was reversed in part because a majority of the three-judge panel concluded that the “indication of innocence’ standard accepted by seven other federal Circuit Courts of Appeal was not consistent with the common law in existence at the time *42 U.S.C. § 1983* was enacted, and did not comport with the requirements of the U.S. Supreme Court. “When defining the contours of a claim under *§1983*, we look to the ‘common-law principles that were well-settled at the time of its enactment.’”

*Nieves v. Bartlett,* 587 U.S. 391, 405 (2018), citing *Kalina v. Fletcher,* 522 U.S. 118, 123 (1997) and *Manuel v. Joliet,* 580 U.S [page citation omitted], 137 S. Ct. 911, 197 L. Ed. 2d 312, 324 (2017) (common law principles "guide" the definition of claims under *§1983*). The panel held that "a formal end to a prosecution in a manner not inconsistent with a plaintiff's innocence is a favorable termination." *Laskar v. Hurd,* 972 F.3d 1278, 1288 (11th Cir. 2020). Dr. Laskar's case met this newly announced standard because his criminal prosecution was dismissed by reason of the expiration of the statute of limitations. [Doc. 19, ¶190]. The panel majority held that the favorable- termination requirement requires only that the criminal proceedings against the plaintiff formally end in a manner not inconsistent with his innocence on at least one charge that authorized his confinement." *Laskar supra,* at 1295. Because Dr. Laskar's criminal prosecution was dismissed because the statute of limitations had expired, and his complaint did not allege that he was convicted or that he had admitted his guilt to each charge presented to justify his seizure, the panel concluded that Dr. Laskar had successfully alleged that he had received a favorable termination. [*Id.*]; [Doc. 36, 37 and 38].

Following the panel's decision, the Appellees filed a petition for a rehearing *en banci,* which was denied.

**B. Petition For Certiorari to the United States Supreme Court.**

Appellees proceeded next to file a petition for certiorari to the United States Supreme Court, asking that this case be held pending the Supreme Court's forthcoming decision in another case arising from the Second Circuit Court of Appeals and for which certiorari had been granted after the petitioners highlighted the Eleventh Circuit's ruling in *Laskar v. Hurd.* The Supreme Court complied with Appellees' request and held this case pending its decision in *Thompson v. Clark,* Case No. 20-659. With the consent of all parties, proceedings in this case were stayed pending the Supreme Court's decision in *Thompson* and/or its ruling on the Appellees' petition for certiorari. [Doc. 52].

On April 4, 2022 the Supreme Court issued its decision in *Thompson v. Clark*, holding that a plaintiff who brings a malicious prosecution claim pursuant to *42 U.S.C. § 1983* need not demonstrate that the underlying criminal proceeding ended with an indication of innocence; rather, he or she needed only to demonstrate that the proceeding was ended without entry of a conviction. *Thompson v. Clark*, 596 U.S. 36 (2022).

Following the Supreme Court denied the petition for certiorari filed by Appellees in this case, as the decision in *Thompson v. Clark,* effectively mooted the Appellees' issues. This case was subsequently remanded to the Eleventh Circuit, then on to the district court for the commencement of discovery. [Doc. 55].

**C. The Appellees' Motion For Summary Judgment.**

On June 30, 2024, the Appellees filed a motion for summary judgment. [Doc.87]. In their Motion, Appellees advanced two grounds for why the district court should enter judgment in their favor. First, Appellees contended that probable cause existed for the Appellant's arrest. Second, Appellees, as state officials performing discretionary investigative duties within the scope of their employment, maintained that they had no liability to Plaintiff-Appellant on the basis of qualified immunity. Appellees asked for the entry of summary judgment in their favor. [Doc. 87-1].

In response, Appellant contended that the Special GBI Agent who had signed and presented two Affidavits For Arrest of the Appellant to Fulton County Magistrate Judge Richard Hicks failed to attest to having personal knowledge of the charges and related facts. The subject Affidavits stated "Personally came S/A LISA VORRASI, who on oath says that to the best of his/her knowledge and belief. . . . " Such language is not an unambiguous statement of personal knowledge. Appellant also responded that Special Agent Lisa Vorrasi had failed to present any facts within the body of the subject Affidavits, never addressing the Appellant's conduct or the circumstances demonstrating that probable cause to arrest him existed. The subject Affidavits merely listed crimes for which Appellant was being charged. Appellant additionally contended that the Special Agent made no further oral presentation to the Magistrate Judge. Appellant relied on the

statements and admissions of Special Agent Vorrasi when presenting these responses. [Doc. 109/109-1, Vorrasi Dep., pp. 172-173 of 204, also Exh. 64 thereto]. Appellant contended there was no information presented to enable the Magistrate Judge to make an independent finding that probable cause existed to arrest Appellant. [*Id.*].

Appellant showed that the improper scope imposed upon the investigation – of him required Appellees to consider only information pertaining to him and his faculty startup company without comparing and contrasting his conduct with what other faculty and faculty startups were doing. As a result, the findings of unlawful conduct respecting Appellant were false, misleading and incomplete. The constrained investigative scope meant that the findings were recklessly in disregard of the truth. It was Appellant's contention and proof that the disputes of material fact regarding what was permitted at Georgia Tech regarding the use of Georgia Tech monies for the fabrication of prototype computer chips required that the qualified immunity defense be submitted to a jury to consider the evidence..

Oral argument was had before the district court on December 17, 2024. [Doc. 114, Oral Argument Scheduled; Doc. 116, Transcript of Proceedings]. Appellant was invited to submit a further brief, which was filed on January 7, 2025. [Doc. 117]. A response was filed by the Appellees on January 17, 2025. [Doc 118].

On March 14, 2025 the District Court entered an Order granting the Appellees' Motion For Summary Judgment.

## SUMMARY OF THE ARGUMENT

Appellant shows that he is able to prove a malicious prosecution claim brought pursuant to *42 U.S.C. § 1983* and the Fourth Amendment. Appellant shows that he has presented evidence to show that the conduct for which he was arrested and seized was not illegal, was expressly permitted under longstanding standard practices and procedures at the Georgia Institute of Technology School of Electrical and Computer Engineering.

Appellant shows that the testimonial admission of Appellee Patrick Jenkins - that an expansion to the intentionally limited scope of the investigation was in his humble opinion something that should have been done – has major evidentiary implications for this case. It corroborates the argument Appellant has always maintained - that the investigation's methodology resulted in false, misleading and materially incomplete findings. Further, the investigation was conducted falsely and in reckless disregard of the truth.

The several genuine issues of material fact make it improper for Appellees to have been granted summary judgment on the basis of qualified immunity. There are too many genuine issues of fact that demonstrate there is no probable cause.

Furthermore, the trial court Judge appears desirous of protecting Appellees from responsibility, concluding it is "illogical" to have professional investigators, no matter how actively they participate with law enforcement in continuing their investigation of Appellant, to be treated with any equivalence to law enforcement when it comes to evaluating whether they came to law enforcement with false and reckless findings which were the result of an intentionally incomplete investigation.

## STANDARD OF REVIEW

The propriety of a grant of summary judgment is a question of law to be reviewed *de novo. Williams v. Aguirre*, 965 F.3d 1147, 1158 (11th Cir. 2020). Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Fed.R.Civ.P. 56(a).* In making this determination, the Court will "view the evidence and all factual inferences therefrom in the light most favorable to the non-moving party, and resolve all reasonable doubts about the facts in favor of the non-movant." *Skop v. City of Atlanta,* 485 F.3d 1130, 1136 (11th Cir. 2007) (quoting *Kingsland v. City of Miami,* 382 F.3d 1220, 1226 (11th Cir. 2004)).

## ARGUMENT

### I. Plaintiff Was And Is Able To Prove a Malicious Prosecution Claim.

To prove a claim for malicious prosecution under the *Fourth Amendment,* a

Plaintiff must make a basic foundational showing. He must show "that he suffered a seizure pursuant to legal process that violated the Fourth Amendment." *Laskar v. Hurd*, 972 F.3d 1278, 1284 (11th Cir. 2020) (citing *Williams v. Aguirre*, 965 F.3d 1147, 1157-1159 (11th Cir. 2020)). To do this, a plaintiff must prove both "a violation of [his] *Fourth Amendment* right to be free of unreasonable seizures" and "the elements of the common law tort of malicious prosecution." *Williams* at 1157. (citing *Paez v Mulvey, 915 F.3d 1276, 1285 (11th Cir. 2019)*). Under the common law elements of malicious prosecution, Dr. Laskar must prove that the officers "instituted or continued" a criminal prosecution against him, "with malice and without probable cause," that terminated in his favor, and caused damage to him. *Id.* (internal quotation marks omitted). These are elements "ultimately controlled by federal law." *Grider v. City of Auburn*, 618 F.3d 1240, 1256 (11th Cir. 2010). (quoting *Wood v. Kesler*, 323 F.3d 872, 882 (11th Cir. 2003).

**A. The Record Presents a Genuine Dispute of Fact About Whether Dr. Laskar's Pretrial Detention Was Unlawful.**

Appellees have attempted to thwart the various ways Dr. Laskar can show that his seizure pursuant to legal process was unlawful. Dr. Laskar contends, for example, that the GBI Special Agent presenting Affidavits for his arrest failed to include facts that would have enabled the Magistrate Judge to whom they were submitted to determine independently whether probable cause for Dr. Laskar's arrest existed. Dr. Laskar also contends that the purported thefts for

which he was arrested are completely undermined by record evidence showing that Dr. Laskar, as were other Georgia Tech faculty members in the School of Electrical and Computer Engineering ("ECE"), was fully authorized pursuant to the "standard policies and procedures" in place at the ECE to use Georgia Tech monies to order the fabrication of microcomputer prototype chips that were to be used for student research at the undergraduate, graduate and doctoral candidate levels as well as for research and product development work on behalf of his faculty startup company, Sayana Wireless, LLC ("Sayana").

**1.The Any-Crime Rule Does Not Apply To Malicious Prosecution.**

However, Appellees keep offering other purported acts of wrongdoing on the part of Dr. Laskar to suggest that there existed other independent bases for his arrest. Appellees charge Dr. Laskar, for example, with responding false to a conflict of interest form that faculty members were routinely asked to complete. In Dr. Laskar's case, in a specific two years he returned such forms to his department Chair, Dr. Gary May, reporting that he served as an "advisor" to his faculty startup company, Sayana. This was done while Dr. Laskar also reported that he was co-founder and Chairman of Sayana when submitting a Periodic Peer Review document to a faculty panel at Georgia Tech charged with evaluating his performance as a tenured professor over a period of years after that tenure had been granted. [Doc. 106/106-1, Fuchko Dep., Exh. 27, pp. 21-262 of 385]. He also

disclosed those capacities when reporting to Jilda Garton, the General Manager at GTRC, that "I am a founder and chairman of Sayana Wireless, which is a VentureLab company." Asked if she had followed up to say that was an inadequate disclosure, Ms. Garton responded, "I do not believe that I did, so no, I did not." [Doc. 97-7, p. 3, Prior Sworn Testimonies, p. 3 of 22]. Ms. Garton also testified that Dr. May, the ECE Chair, and Dr. Allen, the GT Senior Vice Provost for Research, had informed her that they were well aware of the relationship between Sayana and Dr. Laskar. [*Id.*, p. 5 of 22]. Dr. Gary May testified that he had heard of Sayana, {*Id.*, p. 6 of 22], and he also testified that it was not uncommon for start-up companies at Georgia Tech to have professors with equity interests in the company. [*Id.*, p. 6 of 22]. By disclosing he was Chairman and co-founder of Sayana in his Periodic Peer Review submission, a copy of which was delivered to Dr. May, Dr. May agreed that Dr. Laskar was not hiding the fact that he was Chairman and co-founder. {*Id.*,p. 9 of 22].

In addition, Appellees have presented to the district court the fact that Dr. Laskar owned an equity interest in Sayana that exceeded the 25% which the Georgia Tech Faculty Handbook Section 38.2 defined a "substantial interest" to be ownership of more than 25% of the assets or stock of any business." The Handbook cites *O.C.G.A. Section 45-10-20* as providing that "Pursuant to Georgia an Employee may not have an ownership interest of more than 25% of the assets

or stock in any business which Transacts Business with the State of Georgia including the Institute" Appellees asked in deposition whether Dr. Laskar owned more than 25% of Sayana, and he conceded that he did, just as he conceded this when asked on April 9, 2010 at a meeting he thought was for the purpose of hearing the Audit investigation results pertaining to the NSC cost overrun. Dr. Laskar answered, incorrectly, that he believed Sayana might be doing business with the Institute since it was working from the Institute's facility. Dr. Laskar was mistaken because he was not aware of, and Appellees did not present to him, the definitional language for "Transact Business" or "Transact any Business" as set forth in the Handbook and in Georgia Code *Section 45-10-20,* which states to transact business is "to sell or lease any personal property, real property, or services on behalf of oneself or on behalf of any third party as an agent, broker, dealer, or representative and means to purchase surplus real or personal property on behalf of oneself or on behalf of any third party as an agent, broker, dealer, or representative." Neither Dr. Laskar nor Sayana meet this definitional test. Appellees continue to make this argument that Dr. Laskar was unlawfully creating a conflict of interest with the Institute by holding a greater than 25% ownership interest without referencing the definitional language just cited. Unless there is a transaction of business, there is no conflict of interest.

This having been said, the Eleventh Circuit has concluded in *Williams* that "the any-crime rule does not apply to claims of malicious prosecution under the *Fourth Amendment.*" *Williams,* 965 F.3d at 1162.

**2. Having Established the Inapplicability of the Any-Crime Rule, Plaintiff Must Prove That The Judicial Determination Of Probable Cause Underlying the Seizure Was Invalid.**

The lawfulness of seizures pursuant to legal process turns on the validity of the legal process itself. *Id.* The Supreme Court has instructed courts to examine whether "the judicial officer issuing such a warrant [was] supplied with sufficient information to support an independent judgment that probable cause exists for the warrant." *Whiteley v. Warden*, 401 U.S. 560, 564, 91 S. Ct. 1031, 28 L.Ed. 2d 306 (1971). Under this standard, "an otherwise insufficient affidavit cannot be rehabilitated [with] information possessed by the [officer] when he sought the warrant but not disclosed to the issuing magistrate." *Id.,* at 565, n.8, *see also W. Point-Pepperell, Inc. v. Donovan*, 689 F.2d 950, 959 (11th Cir. 1982) ("[J]udicial review of the sufficiency of an affidavit for the issuance of a warrant must be strictly confined to the information brought to the magistrate's attention."). As this Court has explained, "In other words, warrantless arrests concern whether the facts known to the arresting officer establish probable cause, while seizures pursuant to legal process concern whether the judicial officer who approved the

seizure had sufficient information to find probable cause." *Williams,* 965 F.3d 1162-1163.

*Williams* announced a further important rule; that it must follow the rule of earlier decisions when deciding whether to focus attention on the facts that were before the magistrate who issued the arrest warrant, or those later decisions that look to facts and circumstances within the arresting officer's knowledge. *Williams,* at 1163. This Court decided in *Williams* that the earlier decisions must be followed, *E.g. Kelly v. Curtis,* 21 F.3d 1544, 1544, 1553-55 (11th Cir. 1994) and *Garmon v. Lumpkin Cty.*, 878 F.2d 1406, 1408-09 (11th Cir. 1989).

In *Williams,* this Court sought to reconcile its precedents by clarifying a plaintiff's burden to prove "a violation of her *Fourth Amendment* right to be free of unreasonable seizures." Citing *Paez,* 915 F.3d at 1285. To meet this burden a plaintiff must establish (1) that the legal process justifying his seizure was constitutionally infirm and (2) that his seizure would not otherwise be justified without legal process." *Williams,* 965 F.3d at 1165.

**3. Laskar Has Established a Genuine Issue of Fact Over Whether He Suffered an Unconstitutional Seizure Pursuant To Legal Process.**

To prevail on his *Fourth Amendment* claim, Dr. Laskar must establish that the legal process justifying his seizure – the affidavits for arrest that enumerated crimes of theft and racketeering – were constitutionally infirm and that

his seizure would not otherwise be justified without legal process. Dr. Laskar is able to prove that his arrest warrant was constitutionally infirm if he establishes either that the officer who applied for the warrant should have known that his application failed to establish probable cause, or that an official, including an individual who did not apply for the warrant, intentionally or recklessly made misstatements or omissions necessary to support the warrant. *Williams,* 965 F.3d at 1165, citing *Paez,* 915 F.3d at 1283, 1287, 1291; (Citing *Black v. Wigington,* 811 F.3d 1259, 1263-64; *Kucynda,* 321 F.3d at 1083; *Kelly,* 21 F.3d at 1443-55; *see also United States v. Leon,* 468 U.S. 897, 923 n.24, 0104 S. Ct. 3405, 82 L. #d. 2d 677 (1984) (explaining that the requirements of the *Fourth Amendment* extend to officers "who provided information material to the probable-cause determination")).

**4 .Dr. Laskar shows that the officer who presented the Affidavits For Arrest, GBI Special Agent Lisa Vorrasi, should have known that her application failed to establish probable cause.**

Appellant contends that the Special GBI Agent who signed and presented two Affidavits For Arrest to Fulton County Magistrate Judge Richard Hicks for the arrest of Dr. Laskar, should have known that her Affidavits were flawed due to the fact that she was not providing a proper attestation of personal knowledge. The Affidavits simply stated "Personally came S/A LISA

VORRASI, who on oath says that to the best of his/her knowledge and belief. . . .“ This statement is not an unambiguous statement of personal knowledge.

The Affidavits were additionally flawed because they enumerated, without more, a listing of crimes for which Appellant was being charged. No facts were presented to explain what acts of Dr. Laskar gave rise to the listed offenses. Nothing was included to show how Dr. Laskar was related to the enumerated offenses, and what acts had he allegedly committed; moreover, how did those alleged acts rise to acts of “theft”or “a pattern of racketeering” Special Agent Vorrasi made no oral presentation to the Magistrate Judge. [Doc. 109/109-1, Vorrasi Dep., pp. 172-173 of 204, also Exh. 64]. Thua, there was no information presented to the Magistrate Judge with which he could have been made an independent finding that probable cause existed for the Appellant’s arrest. [*Id.*].

Importantly, Special Agent Vorrasi testified at deposition “I don’t remember obtaining that specific warrant.” [*Id*]. She was unable to answer if she had made any further oral report to the Magistrate Judge. [*Id.*]. She testified that the only document which she could identify as possibly refreshing her recollection of these events would be the Investigative Case Summary document in her GBI investigative file describing her appearance before Judge Hicks. [*Id.*]. The Investigative Case Summary document was identified and presented to Agent Vorrasi at her deposition, marked as Exhibit 64. Agent Vorrasi confirmed that the

document accurately reported that she had submitted the subject Affidavits to the Magistrate Judge. [*Id.,* pp. 165-166]. But that is all the Investigative Case Summary document substantively reported about Agent Vorrasi's submission or her appearance. No reference was made to any oral presentation made by the Agent to Judge Hicks. [*Id.*].

Vorrasi did testify that before presenting the Affidavits she conversed with Senior Assistant Attorney General David McLaughlin about the charges to be presented. She also testified that before preparing the Affidavits she had taken into account information which had been provided to her by the Georgia Tech Department of Audit. [*Id.,* p. 168 of 204]. She had nothing further to share substantively about these events at deposition, this despite several efforts to test her reported lack of recollection. [*Id.,* pp.. 172-173 of 204]. Her initial response , "I don't remember obtaining that specific warrant," appeared intact in the face of additional questioning. The record attested to by Agent Vorrasi at deposition presents no evidence of oral statements having been made to the Magistrate Judge in addition to the words appearing on the Affidavits themselves. [*Id.*].

**5. An attempt was made to rehabilitate the lack of probable cause demonstrated by Agent Vorrasi's affidavits for arrest with after-the-fact probable cause information presented through Agent**

**Vorrasi's filed Declaration below.**

Though Agent Vorrasi's deposition testimony was constrained by her lack of recollection, the Declaration which she signed and submitted below constituted an attempt to provide additional probable cause information for Affidavits and issued arrest warrants decidedly lacking any. Agent Vorrasi's initial further statement is completely conclusory in nature: "The arrest warrants provide that there was probable cause to arrest Laskar for racketeering in violation of O.C.G.A.§ 16-14-4(a) and (b)." [Doc. 87-5, p. 4 of 323]. Neither the Affidavits she signed nor the State Warrants For Arrest Judge Hicks issued contain any such language. Ms. Vorrasi next states that "The predicate acts for the racketeering charges were making false statements and multiple thefts." In that connection, she further offers, "McLaughlin and I concluded that Laskar and Pinel made false statements in the Georgia Tech conflict of interest forms by misrepresenting their relationship with Sayana and by concealing their ownership interest in the company." She then turns to payment amounts from Georgia Tech to the chip fabrication firm CMP as constituting "acts of theft." Her Declaration attempts to explain:

> Based on our review of the evidence, McLaughlin and I concluded that Laskar and Pinel caused Georgia Tech to make these payments to CMP for chips. We further concluded that Sayana took possession of and used the CMP chips for its own benefit and that Sayana sent CMP chips to ETRI. We concluded that there was probable

> cause to believe that Laskar and Pinel, while associated in an enterprise, Sayana, through a pattern of racketeering activity including false statements and thefts, acquired an interest in or control over Georgia Tech's property, in violation of O.C.G.A.§ 16-14-4(a) and (b).

[Doc. 87-5, Decl. of Lisa Vorrasi, pp. 4-5 of 323].

Agent Vorrasi's Declaration offers background and other information appearing nowhere in her submitted Affidavits for Arrest. Notably, Agent Vorrasi identifies no specific documents which she consulted as having refreshed her recollection of these events. Nor does she identify any persons with whom she had spoken after her deposition was taken about these matters. She mentions conversations with Mr. McLaughlin occurring before or when the Affidavits were being prepared. But she references no conversations with him following her deposition. [Doc. 87-5, Vorrasi Declaration, pp. 3-4 of 323]. Mr. McLaughlin left the Georgia Department of Law in 2020. [Doc. 87-6, Decl. of David McLaughlin, p. 2 of 17]. We are effectively asked to accept that she refreshed her recollection as expansively as she claims all on her own.

Examining Agent Vorrasi's Declaration closely, Attachment 7 to it contains "true and correct copies of the affidavits in support of warrants to arrest Joy Laskar that I presented in the Magistrate of Fulton County on September 22, 2010." [Doc. 87-5, ¶10, p. 5 of 323]. The arrest warrants, Special Agent Vorrasi writes were issued by Judge Hicks. She insists that ***"The arrest warrants provide there was***

***probable cause to arrest Laskar for racketeering in violation of O.C.G.A. § 16-14-4(a) and (b).”*** [*Id.*] (emphasis added). A close reading of the arrest warrants reveals no such language within them. Which means all of Agent Vorrasi's Declaration statements addressing probable cause are after-the-fact statements of attempted rehabilitation.

The Affidavits Vorrasi signed state only that racketeering charges arose “in that the said accused did unlawfully, through a pattern of racketeering activity and proceeds derived therefrom, acquire and maintain, directly or indirectly, an interest in and control of $2,000,000, the property of Georgia Institute of Technology.” [*Id.,* pp. 320-323 of 323]. No facts are presented to show what this “pattern of racketeering activity” was, how the acquisition of or the calculation of $2,000,000 came to be, and what it was that Dr. Laskar personally did to participate in “acts of theft.” There is nothing factually provided to the Affidavits by which the Judge could or would be independently enabled to determine if probable cause actually existed to arrest Dr. Laskar. [*Id.*].

Agent Vorrasi's Declaration now pointedly asserts that “The predicate acts for the racketeering charges were making false statements and multiple thefts,” (Doc. 87-5, ¶11, p. 5 of 323]. She further claims that she and David McLaughlin “concluded that Laskar and Pinel made false statements in their Georgia Tech conflict of interest forms by misrepresenting their relationship with Sayana and by

concealing their ownership in the company," [Doc. 87-5, ¶11, p. 5 of 323]. No such information appears in the Affidavits For Arrest submitted to Judge Hicks respecting Dr. Laskar. [Doc. 87-5, Vorrasi Decl., Attachment 7, pp. 320-323 of 323], Nor were these explanatory statements offered when she was being questioned during deposition. [Doc. 109/109-1, Vorrasi Dep., pp. 165-171 of 204]. She simply reported that she could not recall securing the arrest warrants for Dr. Laskar. [*Id.*, pp. 172-173 of 204 ("I don't remember obtaining that specific warrant.")].

Statements which do appear in the subject Affidavits are devoted to a listing of alleged crimes. There are no explanatory facts to show how the crimes actually occurred. No facts detailing what acts became acts of theft leading to the charged offenses. Or what false statements supporting the acts of theft. Just a bare-bones enumeration of the charged offenses Laskar. That Agent Vorrasi now seeks to add so substantially to that which she reported having no memory of is way more than telling.

To suggest, as do the Appellees, that the professor's report of being an advisor to Sayana was "false," while other statements were being made in writing by Dr. Laskar to his Department Chair that he had co-founded Sayana and was serving as its Chairman. This information was communicated by Dr. Laskar in writing to a committee elected by the faculty and charged with evaluating whether

Dr. Laskar was performing effectively as a tenured professor. Indeed, we are aware of no other University official contending under oath that they were uninformed of Dr. Laskar's true relationship with Sayana. [Doc. 97-7 Notice of Filing of Sworn Testimonies Previous Given by Relevant Witnesses, See Jilda Garton, Gary May, and Mark Allen]. Dr. Laskar was a prominent and well-known professor at Georgia Tech, he had been introduced to audiences on campus eager to learn of his research activities, and was enormously active working to attract grant monies and research alliances to Georgia Tech. To insist that these were "false statements," to demonstrate that Dr. Laskar's alleged falsity extended to the Provost Office's approval to expend Georgia Tech monies to acquire fabricated prototype microcomputer chips is to strain to link together two unrelated alleged events.

**6 . An effort to add after-the-fact explanatory information to support probable cause is being attempted through the Declaration of David McLaughlin.**

With the filed Declaration of David McLaughlin, a similar effort is being made to add after-the-fact explanatory information to support the existence of probable cause for the arrest of Dr. Laskar. [Doc. 87-6, McLaughlin Decl., pp. 3-4 of 17]. Like Special Agent Vorrasi, Mr. McLaughlin begins with recitation of a wholly conclusory statement: ***"The arrest warrants provide that there was probable cause to arrest Lasskar for racketeering in***

***violation of O.C.G.A. § 16-14-4(a) and (b)."*** (emphasis added). Except that they don't. If one compares paragraph 11 of Agent Vorrasi's Declaration with paragraph 9 of David McLaughlin's Declaration, one sees that the text is identical apart from slight changes intended only to be consistent with whose voice is being presented – that of Agent Vorrasi or Mr. McLaughlin. [Doc. 87-5, ¶11] [Doc. 87-6, ¶9].

The extent to which this effort is made confirms that no facts were presented to Judge Hicks from which he could independently determine whether probable cause existed to arrest Dr. Laskar. See *Garmon v Lumpkin Cnty.*, 878 F.2d 1406, 1409 (11th Cir. 1989) (warrant affidavit containing no facts whatever "cannot form a reasonable basis for probable cause;" the affidavit contained nothing but the conclusion that the named individual had committed the crime, "the magistrate could not possibly have conducted the independent assessment required by the *Fourth Amendment* of the possibility that Mrs. Garmon committed the crime charged." See also *Williams v. Aguirre,* 965 F.3d 1147, 1165 (11th Cir. 2020) ("an affidavit does not support probable cause if it lacks any facts that suggest a crime occurred.") (Chief Judge William Pryor); see also *Devier v. State*, 253 Ga. 604, 609 (1984) (holding that though *O.C.G.A. § 17-4-41* does not require arrest warrants to include facts sufficient to demonstrate probable cause for the issuance of the warrant, the *Fourth Amendment* provides that no warrant shall issue, "but

upon probable cause, supported by Oath or affirmation." Before a warrant for either arrest or search can issue the judicial officer issuing such a warrant must be supplied with sufficient information to support an independent judgment that probable cause exists for the warrant.); *Pitts v. State*, 209 Ga. App. 47 (1993) (addressing warrants issued on affidavits only, though they met the requirements of *§17-4-41* they did not supply the magistrate with sufficient information to support an independent judgment that probable cause existed.)

The Supreme Court has instructed courts to examine whether "the judicial officer issuing such a warrant [was] supplied with sufficient information to support an independent judgment that probable cause exists for the warrant." *Whiteley v. Warden,* 401 U.S. 560, 564 (1971). "[A]n otherwise insufficient affidavit cannot be rehabilitated [with] information possessed by the [officer] when he sought the warrant but not disclosed to the issuing magistrate." *Id. 565, n. 8; see also W. Point-Pepperell, Inc. v. Donovan,* 689 F.2d 950, 959 (11th Cir. 1982) ("[J]udicial review of the sufficiency of an affidavit for the issuance of a warrant must be strictly confined to the information brought to the magistrate's attention.").

**7 . Appellant has established that that the legal process justifying his seizure was constitutionally infirm.**

Based on the foregoing analysis, Appellant has

established that the legal process justifying his seizure was constitutionally infirm. Special Agent Vorrasi, should have known that her presentation of Affidavits For Arrest containing no explanatory facts meant that the Affidavits would be devoid of probable cause. *Williams*, 965 F.3d 1147, at 1167 (holding that "an affidavit does not support probable cause if it lacks any facts that suggest a crime occurred." *See, e.g., Garmon,* 878 F.2d at 1410).

**8. Appellant can demonstrate the constitutional infirmity of his seizure by showing that Appellees, who did not apply for the warrant, nonetheless intentionally and/or recklessly made misstatements or omissions necessary to support the warrant.**

As noted above, Dr. Laskar can also prove that the legal process justifying his seizure was constitutionally infirm by showing that an official, including an individual who did not apply for the warrant, intentionally or recklessly made misstatements or omissions necessary to support the warrant. *Williams* at 1165; *United States v. Leon*, 468 U.S. 897, 923 n.24, 104 S. Ct. 3405, 82 L. Ed. 2d 677 (1984). Here, Appellant shows that the Appellees both intentionally and recklessly made misstatements and omissions resulting from the unreasonably constrained "scope" that was intentionally imposed on the investigation which they performed of Dr. Laskar and Sayana. That scope was limited because of available personnel and time. Because it was so deliberately

constrained, it failed to adhere to the attributes of a high quality audit investigation outlined by Mr. Hurd's own Audit counterpart and Chief Audit Officer for the University System of Georgia from 2009 to 2016,, Mr. John M. Fuchko, III. Mr. Fuchko had this to say about the attributes of a quality audit investigation.

**What The University of Georgia Chief Audit Executive**
**At That Time Considers A Quality Audit Investigation To Be**

"[[T]he attributes of a quality audit investigation" are those where the investigation is "[f]irst of all, it's actually correct as much as possible." Also, that "[i]t's hopefully complete." [Doc. 106/106-1, Fuchko Dep., pp. 30-31 of 385]. Mr. Fuchko went on to say the more you can rely on evidence "that isn't subject to being manipulated, then we would say that is going to make for a better audit." [*Id.*, p. 31 of 385]. "And then I think having – I don't necessarily would – I don't know that I would use the word 'fairness,' but I would say one that is as – you know, paints as complete a picture as you can reasonably obtain in light of the investigation itself." [*Id.*, pp. 31-32 of 385]. Asked if before undertaking such an investigation whether a preliminary scope is established, Mr. Fuchko responded, "You will establish an initial scope, but because it's usually – if it involves fraud or if it appears to involve fraud by its very nature, it's almost what I would call 'discovery learning.'" [*Id.*, p 32 of 385].

Mr. Fuchko at this point referenced his predecessor, who served in the same position of Chief Audit Officer. His name was Ron Stark, whom Mr. Fuchko credited with observing, "one of the most – best characteristics of an investigator is to be curious." [*Id.*]. "And so you do – you kind of have to go in with your eyes wide opened up, understanding that this could be anything and often is." [*Id.*] "And so if you kind of go in saying, well, we're just looking for, you know, transactions between this date and this date, you're probably going to miss something." [*Id.*] "So you start out usually with something that is causing you to say, there's an issue in this area, but when you move it out of what I would call policy issues or, you know, internal control challenges into somebody potentially committing fraud, waste, or abuse, it really expands to say, if this person is engaged in some sort of malfeasance involving institutional resources, you have to take a pretty holistic view to understand what they're engaged in because you really at that point have transitioned from an internal control issue to an investigation of a person who is allegedly committing some sort of malfeasance, and then so your scoping is changing in light of that as you go through." [*Id.*, pp. 34-35 of 385]. Asked if the "discovery learning" process would "include comparative information that you might seek?" Mr. Fuchko testified, "Yes, it could. So if it – some of the areas that you might get into – usually less in the case of direct theft, but I'm going to maybe say, for example, if there was nepotism or something along those lines, you might

look there to say, okay, was this – was this a common practice at the institution?" [*Id.*, p. 36 of 385].

Mr. Fuchko's testimony is highly relevant to Appellee Phillip Hurd's intentional decision to limit the investigation to the conduct of Appellant and his faculty startup company only, and not to investigate how such conduct compared or contrasted with the conduct of other similarly situated faculty and faculty startup companies.

**Three Major Categories of Alleged Wrongful Conduct:**

**Use of Institute Resources; Use of Georgia Tech Monies To Acquire Prototype Chips; "Selling" Chips To ETRI**

There were three (3) major categories of alleged wrongful conduct that the Appellees contend Dr. Laskar is guilty of committing. **One,** permitting the faculty startup company Sayana Wireless, LLC to occupy Institute office space, utilize Institute laboratory facilities, avail itself of Institute laboratory testing equipment, make use of Institute computer software and computer assisted design tools, and conduct product demonstrations from Institute offices, without payment or reimbursement to Georgia Tech.. **Two**, to arrange the fabrication of prototype computer chips from a French foundry with Georgia Tech monies and use such chips for research at Georgia Tech to benefit undergraduate students, masters level students, and doctoral candidates as well as for research and product development work on behalf of Sayana. **Three**, to have Sayana enter into a collaborative

research contract with Electronics and Telecommunications Research Institute ("ETRI"), receive substantial amounts from ETRI during the course of that contract relationship in consideration of delivering research reports, and overseeing when necessary the delivery of prototype chips to ETRI to advance the chip design collaboration.. Appellees concluded that Sayana "sold" the chips to ETRI "as finished functional products along with schematics . . . and chip test results." [Doc.103/103-1, Hurd Dep., Exh. 33, p. 426 of 733]. The fabrication of the prototype chips was accomplished with the payment of Georgia Tech monies in a majority of instances. The Preliminary Expert Report of Professor David Ricketts, Ph.D., a highly esteemed researcher who has worked with and at MIT, Harvard and North Carolina State University, provided a written review of the Sayana-ETRI relationship to ascertain if it departed from or corresponded with customary collaborative research undertakings of this kind - and concluded that it fully corresponded with - identified that Georgia Tech monies were used to pay $1,089,625 for fabrication charges and that Sayana supplied monies were used to pay $379,079 for fabrication charges. [Doc. 101/101-1, Ricketts Report, p. 99 of 100]. Dr. Laskar reports that when the availability of Georgia Tech's own monies became seriously constrained by the onset of the Great Recession of 2009, Sayana pulled together funds to pay a portion of the outstanding invoices owed to CMP, the chip fabricator foundry. [Doc. 97-1, Decl. of Joy Laskar, p. 22 of 44].

To the Appellees, all prototype chip fabrication and ETRI research collaboration constituted the taking of Institute resources, the stealing of Institute monies, and the selling of Institute property (the chips) without authorization. These conclusions were wildly inaccurate because the Appellees' investigative scope was limited simply to identifying what Sayana was doing, documenting that conduct, and characterizing for itself (wrongly, falsely and recklessly) what Appellant's conduct represented. No effort was made to identify what other faculty members and other faculty startup companies at Tech had done in these same arenas. Appellees were offended that a professor would run a private company on the premises of Georgia Tech. No effort was made to investigate the "commercialization mission" at Georgia Tech which supported and encouraged these very things. Had they been interested, Appellees would have learned from Dr. Laskar what other faculty and other faculty startup companies were engaged in the same kind of activities. Dr. Laskar listed them in his Declaration:

(1) CardoioMEMs founded then by faculty member, later Institute Senior Vice Provost for Research, Dr. Mark Allen;

(2) Axion Biosystems founded by Dr. Allen and Dr. Steve DeWeerth;

(3) Suniva founded by Dr. Ajeet Rohitgi;

(4) E-System Design founded by Dr. Madhavan Swaminathan;

(5) Jacket Micro Devices founded by Dr. Madhavan Swaminathan James Stratigos, Jr., Dr. George White, Dr.Rao Tummala, and Dr. Sidharth Dalmia;

(6) Digital Furnace founded by Dr. John Limb and Daniel Howard;

(7) Innovolt founded by Dr. Deepak Divan;

(8) Lanscope founded by Dr. John A. Copeland; and

(9) Nexidia founded by Dr. Mark A. Clements.

[Doc. 97-1, Decl. of Joy Laskar, pp. 18-19 of 44]. It bears noting that when Appellee Patrick Jenkins interviewed VentureLab Catalyst Paul Freet in November 2010 – after the arrest of Dr. Laskar on September 24, 2010 but well in advance of the Professor's tenure revocation hearing in March 2011 and even further in advance of the presentation of charges to a grand jury (at which Audit staff member Melissa Hall presented evidence on behalf of the State) [Doc. 105/105-1, Hall Dep., pp. 240-244 of 348], on December 30, 2014. In that interview, Mr. Freet explained how startup companies at Georgia Tech often worked on campus, in founder garages, or wherever they could find space. Mr. Freet explained that this was not unusual, owing to the vagaries of the startup process and the limited funds which many such companies had available to them. Questions about why Sayana had not established a cost center to track and pay an agreed value for the use of Tech space and equipment were met with Mr. Freet's explanation that that too was

not unusual. Mr. Jenkins seemed surprised that that could be the case even years after the startup's organization as a company, but Mr. Freet responded that it was not unusual. [Doc. 98, Recorded Interview of Paul Freet]. Mr. Jenkins certainly had adequate time from November 2010 when he interviewed Mr. Freet until before the grand jury presentation on December 30, 2014 to use his influence to caution prosecutors that facts they had believed to be true were not and required further investigation. Bottom line: The prosecution was permitted to continue.

A detailed conversation by the Appellees with Dr. Laskar and focused on the particulars of the investigation was never had, despite the fact it would have been highly educative for the Appellees. Dr. Laskar was never given an opportunity to refute the findings set forth in the draft Official Report or the final Official Report. He was given no chance to educate Appellees on what was actually taking place and why. He was afforded no opportunity to respond before the investigators proceeded to share their findings with law enforcement. Mr. Hurd felt there was no need for that kind of interaction, that there was no sense in giving Dr. Laskar a chance to be "creative" when responding to questions. [Doc. 104/104-1, Jenkins Dep., Exh. 12]. In the one meeting Dr. Laskar was invited to attend with Mr. Hurd, Mr. Hurd denied Dr. Allen's suggestion to give Dr. Laskar "some background" to the meeting so he would not feel surprised. Mr. Hurd replied he

would not, as his "surprise" will give him less time to think of a 'creative' response." [Doc. 104/104-1, Exh. 12].

There was no interest by Mr. Hurd in bringing their findings to the investigative subject to see what explanation, what correction, or what acknowledgements he might offer, despite the fact doing so is a recognized part of an effective investigative process. [Preliminary Expert Report of William Salinski, Doc. 100/100-1, pp. 10-11 of 213] [Doc. 105/105-1, Hall Dep., p. 119 of 348 ("Would be a normal process.")].

**The Intentional And Reckless Investigative Scope Leading To Incorrect Investigative Findings**

Appellees were adhering to a limited investigative "scope" focused exclusively on the conduct of Dr. Laskar and Sayana. If Dr. Laskar and his faculty startup company were determined to be occupying office space and utilizing Institute research facilities without making payment for them, that meant to Appellees that Sayana was doing something unlawful. Their operational approach was simply to document these facts, document further that there existed no lease or contractual undertaking authorizing such usage, and conclude it was unlawful. Of course, there was no lease or contractual undertaking; no faculty startup company at Tech in the ECE School was required to pay Georgia Tech for the privilege of using its resources. To broaden that focus to compare and contrast the conduct of

other faculty and other faculty startup companies engaged in the same activities as was Dr. Laskar and Sayana would violate the investigation's established "scope."

**Appellee Jenkins's Admission As To Scope**

But a remarkable thing occurred during the taking of Appellee Patrick Jenkins's deposition. Mr. Jenkins acknowledged that the investigation of Dr. Laskar and Sayana should have been expanded. When questioned whether something identified as "suspicious" might be addressed more fully if the actions and conduct of other companies were also being investigated, Appellee Patrick Jenkins conceded that was "a good question.' But then he offered, "It's a different audit though. It's not what we were doing." [Doc. 104/104-1, pp. 138-140 of 459, transcript pp. 136-138]. Asked "What is a different audit?" Mr. Jenkins responded:

> So you asked if there was – you know, this
> audit focused on where were the funds going,
> right? What -- what was going on with the money?
> That's a completely different audit scope of,
> "Hey, let's go review operational procedures for
> for memberships for all of GEDC."
> That's a completely different audit scope.
> One that probably should have been done
> in my opinion. But for the purpose of this –

> this audit or this review, this special review, that wasn't in the scope. Could it have been in scope? Could it – I mean, could have expanded to that scope? Should – should leadership chosen to go that direction? Yeah. Sure. That would have spun up a different audit though.

Asked "if you had a chance to be speaking to leadership, would you have recommended that?" Mr. Jenkins answered:

> **Yeah. Knowing -- knowing what we know now or what we did at the time, yeah. It would have made sense to – to do that. But you also got to understand too we're limited on resources. So.**

Asked in what way they were limited, Mr. Jenkins responded:

> **Personnel, time. I mentioned those other cases. Two of those are ongoing at the same time, right? So there's so much you can do in a -- within the timeframe, right? So it's – should there be a more thorough**

> **review of – of GEDC and its operations?**
>
> **Yeah. Based on what we've seen with what was going on with, you know, when Dr. Laskar was there, yeah. Absolutely. It would warrant further review in my humble opinion.**

[Doc. 104/104-1, Jenkins Dep., pp. 138-140 of 459; transcript pages 136-138] (emphasis supplied).

**Intentionally and Recklessly Caused Omissions**

Appellees never even presented their findings to Appellant after they were issued. Appellant's first awareness of the investigation focused on him came with the highly publicized search and seizure orchestrated with the Georgia Bureau of Investigation. Appellees did present their findings to Mr. Hurd's counterpart at the Board of Regents, John M. Fuchko, III, the Chief Audit Executive for the University System of Georgia, and also to Senior Assistant Attorney General David McLaughlin. Mr. McLaughlin reacted immediately when he attended an in-person presentation of the Appellees' findings, conducted on or about the very date the Official Report was issued on April 14, 2010. When Mr. McLaughlin emerged from the presentation, he was of the view Appellees had demonstrated the existence of probable cause to believe crimes were being committed. [Doc. 109/109-1, Vorrasi Dep., Exh. 2, Letter of David McLaughlin to GBI Director

requesting the initiation of a formal GBI criminal investigation]. In his letter to the GBI Director, sent within seven days of attending Mr. Hurd's presentation, Mr. McLaughlin wrote, "In addition to stealing as much as $600,00, the employees allegedly stole a considerable amount of resources and technology by running their private business at Georgia Tech." He concluded, "It is clear that crimes have been committed that warrant immediate criminal investigation." [*Id.*].

The certitude expressed by Mr. McLaughlin so quickly after hearing the presentation by Mr. Hurd signals several salient points. One, it is apparent that Appellees were demonstrating confidence with respect to their reported findings. But given the misgivings which Appellee Jenkins expressed about the validity of the scope to their investigation, and his own expressed opinion that a broader scope was merited because other Georgia Tech faculty had startup companies of their own and hung over the reported findings as a large question mark. What consideration was given by Mr. Hurd to the "commercialization" mission that Georgia Tech took so seriously? Key School of ECE figures Dr. Jennifer Hasler, a Georgia Tech Regents Professor, and Dr. Roger P. Webb, the longest serving Chair of the ECE School, unequivocally report the fact that:

> (1) Georgia Tech faculty and faculty startup companies were fully entitled to use available Georgia Tech office space, laboratory facilities,

testing equipment and computer software resources without payment or reimbursement to Tech;

(2) Those same parties were entitled to use Georgia Tech monies, VentureLab monies, and gifted monies for the purchase of fabricated prototype computer chips so long as student research associated with the chips would be performed. They reported unambiguously that this held true even if research work was being expended on the faculty startup companies' own research and product development efforts; and

(3) Georgia Tech professors had many contacts and working relationships with ETRI, as ETRI was recognized as a quality advisor for the design and advancement.of chips.

**The Declaration of Dr. Roger P. Webb.**

The Declaration of Dr. Roger P. Webb, [Doc. 97-3], is essential reading for any jurist reviewing the important facts and circumstances bearing on this case. Remarkably, the Order entered by the district court acknowledges not at all the information attested to by Dr. Webb. His Declaration does not exist insofar as the district court's written Order is concerned. Dr. Webb is Professor Emeritus and former Chair of the School of Electrical and Computer Engineering ("ECE") at Georgia Tech. He is not just any former ECE Chair. He is its most distinguished. A plaque has been erected in Dr. Webb's honor at Georgia Tech commemorating his

service to the school. And each year the ECE conducts the Roger P. Webb Awards Program, where awards are given to faculty, research staff, and students who demonstrate excellence in research, teaching, electrical engineering, computer engineering and mentorship. {*Id.*, pp. 2-3 of 15]. This continues to this day. [*Id.*]. Dr. Webb first assumed this post in 1988. [*Id*].

Perhaps most impressive about Dr. Webb's tenure is the important strategic work he performed to bring Georgia Tech to its current position as one of the world's preeminent research and entrepreneurial centers for microelectronics and electrical and computer engineering. Dr. Webb was focused on *building* Georgia Tech's engineering expertise. To accomplish this goal he *recruited* scholars and he *built* a physical plant to create research centers of excellence. During his very first year as School director, Dr. Webb recruited 12 new faculty members. Then in 1990 he led Georgia Tech's participation in the formation of the Georgia Research Alliance ("GRA"). With data showing that the State was losing high technology startups lured away from Georgia by private equity capital more prevalent and robust in places like California, Texas and Massachusetts, Georgia's Governor, with legislative support, and together with leaders of private industry, as well as a group of select Georgia universities with significant high technology research activities ongoing, came together to form the GRA. Its objective was to foster new economic development within and for Georgia. Its strategy was to recruit world

class scholars to selected Georgia universities, scholars who could also attract significant research funding, develop new intellectual property, and foster the support of new startup companies that would monetize that technology and offer new jobs to Georgia citizens. Dr. Webb knew how to recruit. GRA provided one-half of the initial funding to establish newly endowed faculty positions. These faculty were to be called "GRA Eminent Scholars." The remaining one-half of the needed monies would be raised from private sources. GRA also created programs to accompanying establishment of these new faculty positions, with monies to be used to seed the formation of new faculty startup companies. [*Id.*, pp. 3-4 of 15].

The State of Georgia contracted with a Silicon Valley company called Cadence to assist these economic development efforts. Cadence wanted to work with designated faculty at select universities in Georgia to enhance programs in electrical engineering and computer science. Georgia would use Cadence's capital and marketing resources to develop new startup companies based upon the faculty research and faculty-generated products emanating from participating state universities. Dr. Webb led Georgia Tech's participation in this program. He recruited two other faculty members at Tech to assist him in this effort, one of whom was Dr. Joy Laskar. Working with Dr. Laskar, Dr. Webb fashioned a proposal to the State of Georgia to utilize Cadence monies to create 80 new faculty positions across the participating Georgia universities; 40 of those new positions

would go to Georgia Tech. In addition, significant new monies would be allocated and used for the creation of endowed chairs, which the newly recruited faculty would assume, together with additional continuation funding to enable and support faculty research. Georgia Tech became a major beneficiary. As noted, 40 of the 80 new faculty positions went to Georgia Tech, and with each new position came funding support for the faculty that were attracted to come. In 1993 the School of Electrical Engineering became the School of Electrical and Computer Engineering. Dr. Webb's title changed from director to Chair. In 1994, Dr. Webb was serving both as Chair and Interim Director for an organization which became the Institute for Electronics and Nanotechnology ("IEN"). A new building housing this Institute was constructed with one-half of the monies coming from the State of Georgia and the remaining one half raised from Atlanta philanthropist Bernie Marcus. The new facility opened in 2009, delivering to Georgia Tech superior facilities in which to perform electronics research. [*Id.*, pp. 5-8].

During Dr. Webb's 16-year tenure as head of the ECE School, the number of faculty grew from 59 to 115. Annual research expenditures grew from $5 Million to more than $50 Million. The number of annually awarded Ph.D. degrees climbed to 105. [*Id.*, p. 9 of 15].

**GT Standard Operating Practice And Procedure**

In light of the success in attracting eminent new faculty and constructing outstanding new physical plant facilities, Dr. Webb reports in his Declaration that the "standard operating practice and procedure" at ECE and GEDC was to allow faculty and their faculty startup companies to use Institute laboratory space, equipment, and facilities without any need or requirement to pay or otherwise reimburse the Institute for that use."[{*Id.*, p. 10 of 15].

> It frankly made no sense for members of the Institute leadership like myself to work as hard as we had in securing funding for faculty and buildings, and to advance our goal of making Georgia Tech a contributor to Georgia's economic development, if we did not make the newly constructed space, resources and equipment available for faculty start-up companies to use. It has long been true that Georgia has suffered from a relative lack of private equity investment for start-up companies as compared to other states, like California. The direct investments made by the State of Georgia through GRA, and the work by those at the Institute in expanding spaces, resources and amenities were all viewed as essential to correcting that relative imbalance among the states. Our doing the work which we did advantaged the Institute and its affiliated entity, the Georgia Tech Research Center [Corporation] (GTRC). GTRC serves as the custodian for and holder of the

intellectual property which our Institute faculty creates, and it is the GTRC which licenses that faculty-created technology back to its faculty creators and/or the start-up companies they create, so that they can thrive, advance and sell. Through faculty start-up companies the technology developed at Georgia Tech is showcased and proven and become the contributor to Georgia's economic development which the GRA was originally meant to foster. Importantly, the GTRC has held and will hold in many instances an equity interest in these start-up companies, which means that upon a start-up company's sale or its entry into a related financial transaction, as much and perhaps even more of the Institute's 'investment' in supporting any given start-up company can be returned to Georgia Tech in the form of sale or transaction proceeds. An additional value is derived by the Institute upon publicly celebrating a successful home-grown start-up company that may deliver to society a better way of doing something, or an improved medical care technology, or a much=needed innovative solution to a problem challenging the planet. All of which luster to Tech's growing reputation as one of the world's preeminent institutions of higher education, research and innovation."

[*Id.*, pp. 11-12 of 15}

**ETRI As A Faculty Startup Frequent Partner**

Dr. Webb's Declaration described the fact that "several faculty in the School of ECE were engaged in collaborative research agreement with the Electronics and Telecommunications Research Institute ('ETRI'), a South Korean funded research institute." Dr. Webb explains the motivations for Georgia Tech faculty and the ETRI to work together in this way. He notes how contractually ETRI is prohibited from "stealing" any technology. And he describes how ETRI was a source of much-needed funds to start-up companies during the inevitable difficult periods when they were trying to keep their heads above water. The chips that were sent to ETRI were in all instances prototype chips. They were not, and could not, be sold to ETRI. [*Id.*, pp. 12-13 of 15].

**A Standard Practice And Procedure For The Payment Of Prototype Chips At Georgia Tech**

Dr. Webb reports that it was "a standard practice and procedure" at Georgia Tech during his tenure and during years following 'for the Institute to assume the responsibility to pay for prototype chips being fabricated and used for these kinds of research purposes." [*Id.*, p. 13 of 15]. "The fact that research was conducted on the chips also by researchers or engineers working on behalf of a Georgia Tech faculty start-up company did not alter that standard practice or approach." [*Id.*]."This was all part of the Institute's continuing efforts to support

commercialization and to achieve the various outcomes and benefits which I have described above." [*Id.*, p. 14 of 15].

Dr. Webb reports that the events involving Dr. Laskar in 2010 "were profoundly disruptive to the reputation of Tech's commercialization efforts and all the painstaking groundwork which we had performed." [*Id.*]. He goes on to state that any Institute faculty member made subject to the kind of serious charges confronting Dr. Laskar and his company "deserved at the very least to have undergone an investigative process that was comprehensive and complete, and which secured information about how all faculty and all start-up/spin-out companies were then operating and interacting with Georgia Tech. Without that full context, there could be no true understanding of what the Georgia Tech commercialization process was all about and how it was being operated and pursued." [*Id.*, pp. 14-15 of 15].

**The Declaration of Dr. Jennifer Hasler**

The Declaration of Dr. Jennifer Hasler is found at Doc. 97-2. Dr. Hasler is a Regents Professor in the Georgia Tech ECE School, a member of the Honor Society of The Institute of Electrical and Electronics Engineers, and holder of a Master of Divinity degree from The Candler School of Theology at Emory University. She is officially ordained; Dr. Hasler is the recipient of several professional awards and is accomplished for her work from 2002 to the present

day. She was responsible for accomplishing the First System on Chip ("SoC") respecting Field Programmable Analog Arrays ("FPAA") together with development of the First FPAA synthesis tools. [*Id.*, p. 3 of 10]. She is founder of The Integrated Computation Electronics laboratory at Georgia Tech, which is affiliated with the Laboratories for Neural Engineering. She has founded four start-up companies during the course of her association with Georgia Tech. [*Id.*].

Dr. Hasler's Declaration is highly probative for the issues presented in this case, in part because she takes care to document the benefits that faculty in the School of ECE and working through GEDC. Those benefits included access to and use of computer aided design equipment, use of other design tools, access and use of computers for academic and research activities. Dr. Hasler reports that all of these benefits and access were equally available to faculty for use in advancing their respective faculty startup companies and without any obligation or responsibility to effectuate payment to Georgia Tech for the usages. [Doc. 97-2, pp. 4-6 of 10].

Dr. Hasler reports that other faculty were doing the same things as she, and the subject usages were so prevalent among faculty, she said, "that I would characterize them as standard practices and procedures at Georgia Tech." [*Id.*, p. 6 of 10]. Such standards and practices include "using unrestricted funds, VentureLab funds, and gifts paid for research all for the fabrication of building block and

prototype chips to support research, to support the creation of student dissertations and faculty peer review publications, to allow faculty to attend industry and academic sponsored events for which students and/or faculty members generated and presented papers as part of the seminar programs." [*Id.*, p. 7 of 10]. Georgia Tech, she said, "did not look for or demand reimbursement of any costs purportedly incurred as a result of the use of Institute facilities or equipment." [*Id.*]

Faculty startup companies, like that of Dr. Laskar and those which she founded, were responsible, she explained, only for securing patent protection for the technologies which the faculty startups created, used and advanced. [*Id.*]. Dr. Hasler said it was "common practice" at ECE and Georgia Tech to demonstrate research prototypes to interested parties, including potential customers." Research prototypes extended to "prototype integrated computer chips". [*Id.*].

Importantly, Dr. Hasler declared that Georgia Tech "was active in providing monies to pay for the fabrication of prototype chips with specific research for which faculty professors applied" for grant funding, like the National Science Foundation, DARPA, or other external sources.. The only limitation was that prototype chips could not be sold for commercial use, and to her knowledge this was never done. She explained that prototype chips "did not have inherent market value, as they were merely prototype and not final production chips." [*Id.*, p. 8 of 10]. Within these parameters, she declared that it "was commonplace for Georgia

Tech monies to be used to facilitate the fabrication and design of prototype chips, whether for basic research purposes or for both research and [product] development work" involving a faculty startup company. [*Id.*].

Dr. Hasler reported that Dr. Laskar's investigation and arrest was "shocking" to her and to her colleagues. [*Id.*] She and others began to worry that they, too, might be singled out and shamed in the same manner as was Dr. Laskar. She reports that the Institute never came forward with a "frank and candid' explanation about what had happened and why. [*Id.*, pp. 8-9 of 10]. She also reports never receiving any information to suggest that those who were investigating Dr. Laskar and his company were also investigating what other faculty startup companies were doing respecting their use of Georgia Tech facilities, resources and equipment. [*Id.*, p. 9 of 10].

Dr. Hasler gave a statement for use at the tenure revocation hearing for Dr. Laskar taking place in March 2011. She reported hoping she would be contacted by Georgia Tech investigators to provide information. This did not occur. She reports that entrepreneurship at Georgia Tech was harmed by what happened with Dr. Laskar. She cites a lessened interest among faculty with whom she deals to establish startup companies. But she also reported that she personally is working on a Faculty Entrepreneur Council which she proposed for creation, in an attempt to restore the same impetus for commercialization which previously existed at

Georgia Tech. She remains hopeful that over time she and those she works with can succeed. [*Id.*, p. 10 of 10]..

**9. Even if the false statement of "theft" is removed, Vorrasi's Affidavits remain insufficient to establish probable cause.**

The information presented by Drs. Webb and Hasler demonstrate that it was a standard practice and procedure for Georgia Tech monies to be used to acquire prototype chips for use in research. This standard is unaffected even if usage of the prototype chips is for both student research and product development research for faculty startup companies. Taking the information from Drs. Webb and Hasler as correct means the false and reckless statements of "theft and "racketeering" in thr warrant application are not true. If these false and reckless statements are removed, the Affidavits remain insufficient to establish probable cause. *Paez,* 915 F.3d at 1287 (quoting *United States v. Kirk,* 781 F.2d 1498, 1502 (11th Cir. 1986).

Appellant submits that the record presents a genuine dispute of material fact. Are the statements and omissions in the warrant application true or were they "made either intentionally or in reckless disregard for the truth. *Paez,* 915 F.3d at 1287. The information presented by Appellees to prosecutors was that Georgia Tech monies could not be used to purchase prototype chips for faculty startup company research even where, as here, the chips were being used also for student

research. (Doc. 103/103-1, Hurd Dep., Exhibits 42-44 evidencing research performed on the chips in question by researchers Ho-Lee, Leung, and Yeh].

Dr. Webb, Dr. Hasler and Dr. Laskar do not agree and they cite an environment of longstanding standard practices and procedures as support. At the very least Appellant has demonstrated the existence of a genuine dispute, of material fact, and the district court was bound to weigh all inferences in Appellant's favor and, it is submitted, send the case to trial. The district court said it doesn't believe a reasonable jury would find in the Appellant's favor, and that seems to justify its decision. At oral argument, the district court said "I think that your client is lucky he's not in prison, is what I think. I think the fact . . . these charges weren't brought when they were brought is a benefit to him. I think your argument is one that you could make to a jury, but I don't believe it that if it was indicted in this court that it would ever make it to a jury, because I believe that a good criminal defense lawyer would have pled out very early. " [Doc. 116, Transcript of Oral Argument, p. 51, lines 7-16]. Seated at Appellant's counsel table was co-counsel Craig Gillen, Dr. Laskar's criminal attorney who successfully presented a Plea in Bar and Demurrer to the Superior Court of Fulton County winning a dismissal of all charges against Dr. Laskar. [*Id.*]. The Order issued by the district court does not reference any of the foundational evidence presented on these points by Drs. Laskar, Webb and Hasler.

## II.

**Appellees are not entitled to summary judgment based on qualified immunity as there are genuine issues of material fact respecting whether the investigative methodology and the investigative findings delivered to law enforcement were insufficient to establish probable cause. The district court was in error when it concluded that the Appellees were "at most 'merely negligent'" in their disregard for the truth.**

Any reasonable officer would know that a seizure that as constitutionally infirm because it was secured through false or misleading evidence would create damages liability no matter what kind of legal process led to that kind of seizure. See *Jarrard v. Sheriff of Polk Cnty.*, 115 F.4th 1306, 1325 (11th cir. 2024); *see also* United States v. Lanier, 520 U.S. 259, 27 (1997). ( fonfirming "a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in quetio, even though the very action in question has not previously been held unlawful."

## III.

**In light of Appellee Jenkins's admission, and the failure of Appellees to broaden their investigative scope, Appellees have acted with actual malice toward Appellant or with a wilful and conscious disregard of consequences.**

The law in 18711 was unanimous that both criminal and civil proceedings leading to an arrest were tortious conduct remedied by malicious prosecution claims. *Gervin v. Florence*, 2005 U.S. App. LEXIS 14096 (June 9, 2025).

## CONCLUSION

Appellant respectfully requests that this Court reverse the Order of summary judgment entered by the District Court, to vacate the Judgment entered in this case, and to remand the case for trial before a jury of the Appellant's peers.

Dated: July 9, 2025.

Respectfully submitted,

*/s/ Michael A. Dailey*
Michael Alan Dailey
**ANDERSON DAILEY LLP**
1880 Dinsmore Road
Milton, Georgia 30004
770 827 6510 mobile
404 442 1818 office
mdailey@andersondailey.com

Craig A. Gillen
Georgia Bar No. 294838
**GILLEN & LAKE LLC**
400 Galleria Parkway, Suite 1920
Atlanta, Georgia 30039
Tel: (404) 842-9700
cgillen@gwllawfirm.com

*Counsel for Appellant*

## CERTIFICATE OF COMPLIANCE

1. This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) . This document contains 12183 words.
2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word processing program, version 8.1 and updated by Microsoft Exchange 365 in 14 point Times New Roman font.

/s/ *Michael A. Dailey*

Attorney for Appellant

Dated: July 9, 2025

## CERTIFICATE OF SERVICE

Counsel for Appellant hereby certifies that on this day he has filed the Brief of Appellant utilizing the Eleventh Circuit Court of Appeals electronic filing system which sends a copy of the filing to all listed counsel of record.

This 9th day of July, 2025.

*/s/ Michael A. Dailey*
Michael Alan Dailey
**ANDERSON DAILEY LLP**
1880 Dinsmore Road
Milton, Georgia 30004
770 827 6510 mobile
404 442 1818 office
mdailey@andersondailey.com