No. 25-11296

In the

# United States Court of Appeals
## for the Eleventh Circuit

Joy Laskar,

*Plaintiff-Appellant*,

v.

Phillip W. Hurd, et al.,

*Defendant-Appellees*.

On Appeal from the United States District Court for the Northern District of Georgia, Atlanta Division.
No. 1:18-cv-04570 — William M. Ray, II, *Judge*

## BRIEF OF APPELLEES

Christopher M. Carr
*Attorney General of Georgia*
Loretta L. Pinkston-Pope
*Deputy Attorney General*
William W. Peters
*Senior Asst. Attorney General*
Ellen Cusimano
*Senior Asst. Attorney General*
Office of the Georgia
Attorney General
40 Capitol Square, SW
Atlanta, Georgia 30334
(404) 458-3597
ecusimano@law.ga.gov
*Counsel for Appellees*

**CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT**

I hereby certify that the following persons and entities may have an interest in the outcome of this case:

Carr, Christopher M., Attorney General, Counsel for Appellees;

Chalmers, Roger A., Senior Assistant Attorney General, Counsel for Appellees;

Cusimano, Ellen, Senior Assistant Attorney General, Counsel for Appellees;

Dailey, Michael A., Counsel for Appellant;

Gillen, Craig A., Counsel for Appellant;

Hurd, Phillip, Appellee;

Jenkins, Patrick, Appellee;

Kang, Jason H., Assistant Attorney General, Counsel for Appellees;

Laskar, Joy, Appellant;

Peters, William W., Senior Assistant Attorney General, Counsel for Appellees;

Pinkston-Pope, Loretta L., Deputy Attorney General, Counsel for Appellees; and

Ray, William M., II, United States District Judge.

/s/ *Ellen Cusimano*
Ellen Cusimano

## STATEMENT REGARDING ORAL ARGUMENT

Appellees do not request oral argument in this case. The facts and legal arguments are adequately presented in the briefs, and oral argument would not significantly aid the decisional process.

## TABLE OF CONTENTS

**Page**


Statement Regarding Oral Argument ........................................... i

Table of Authorities ..................................................................... iv

Statement of Issues ....................................................................... 1

Introduction ................................................................................... 4

StateMent of the Case .................................................................. 8

A. Factual Background ............................................................ 9

1. Laskar and Sayana....................................................... 9

2. Georgia Tech's Conflict of Interest Policy ...................... 9

3. Hurd and Jenkins' Audit.............................................. 11

4. Hurd's Report of Suspected Malfeasance .................... 15

5. GBI's Criminal Investigation into Laskar and Sayana.16

6. Laskar's Termination from Georgia Tech.................... 20

B. Proceedings Below............................................................. 21

C. Standard of Review ........................................................... 23

Summary of Argument ................................................................ 23

Argument ..................................................................................... 26

I. Hurd and Jenkins did not commit malicious prosecution in violation of the Fourth Amendment. ................................. 27

A. Hurd and Jenkins did not "intentionally or recklessly" make a misstatement or omission. ............................... 29

**TABLE OF CONTENTS**
**(continued)**

**Page**


B. The omitted information, if included in the arrest warrant, would not negate probable cause. .................. 32

C. Laskar cannot establish a causal connection between the audit and his arrest................................................ 35

D. The validity of the arrest warrant in this case is immaterial because Laskar's detainment was brief..... 38

II. Alternatively, the law is not "clearly established" that Hurd and Jenkins violated the Fourth Amendment. .................. 39

Conclusion.......................................................................... 41

## TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Ashcroft v. al-Kidd*,
563 U.S. 731 (2011)....................................................26

*Baker v. McCollan*,
443 U.S. 137 (1979)....................................................36

*Brown v. City of Huntsville, Ala.*,
608 F.3d 724 (11th Cir. 2010)..........................................36

*Carter v. City of Melbourne*,
731 F.3d 1161 (11th Cir. 2013)..........................3, 7, 25, 36

*County of Riverside v. McLaughlin*,
500 U.S. 44 (1991)......................................................39

*Davis v. City of Apopka*,
78 F.4th 1326 (11th Cir. 2023)...................................6, 24

*District of Columbia v. Wesby*,
138 S. Ct. 577 (2018)...............................................26, 40

*Evans v. Stephens*,
407 F.3d 1272 (11th Cir. 2005)......................................40

*Gervin v. Florence*,
139 F.4th 1236 (11th Cir. 2025)....................................27

*Harris v. Hixon*,
102 F.4th 1120 (11th Cir. 2024).....................3, 8, 25, 31, 38

*Kelly v. Curtis*,
21 F.3d 1544 (11th Cir. 1994)........................................32

*King v. Pridmore*,
961 F.3d 1135 (11th Cir. 2020)........................................40

*Laskar v. Hurd*,
972 F.3d 1278 (11th Cir. 2020)..............................1, 36, 38

*Luke v. Gulley*,
50 F.4th 90 (11th Cir. 2022)............................................23

*Mercado v. City of Orlando*,
407 F.3d 1152 (11th Cir. 2005)........................................40

*Oliver v. Fiorino*,
586 F.3d 898 (11th Cir. 2009)..........................................40

*Paez v. Mulvey*,
915 F.3d 1276 (11th Cir. 2019).................2, 6, 23, 24, 25, 28
29, 33, 35, 36

*Rankin v. Evans*,
133 F.3d 1425 (11th Cir. 1998)........................................32

*Rickerson v. Jeter*,
2022 U.S. App. LEXIS 16364 (11th Cir. 2022)...............7, 35

*Sebastian v. Ortiz*,
918 F.3d 1301 (11th Cir. 2019)........................................39

*Smith v. City of Fairburn, Ga.*,
679 F. App'x 916 (11th Cir. 2017)...................................31

*White v. Pauly*,
580 U.S. 73 (2017)..........................................................39

*Williams v. Aguirre*,
965 F.3d 1147 (11th Cir. 2020).....................5, 26, 28, 29, 39

## STATEMENT OF ISSUES

Defendant-Appellees Phillip Hurd and Patrick Jenkins were auditors at Georgia Tech who were asked to conduct an audit into a financial shortfall at the university. During the audit, Hurd and Jenkins discovered malfeasance by Plaintiff-Appellant Joy Laskar (a Georgia Tech professor) and his private company, Sayana. Hurd and Jenkins—as mandated by policy—reported the malfeasance to a university system official, who passed along the information to an assistant attorney general, who in turn contacted GBI and requested a criminal investigation. At the conclusion of the criminal investigation, GBI obtained an arrest warrant against Laskar for racketeering, but the charges were dismissed as time-barred. Laskar sued Hurd and Jenkins for malicious prosecution under the theory that, during the audit, they should have determined whether other Tech professors and companies had engaged in similar behavior and that this failure was an "omission necessary to support [his] arrest warrant." *Laskar v. Hurd*, 972 F.3d 1278, 1296 (11th Cir. 2020). The questions presented are as follows:

1. To prevail on his malicious prosecution claim, Laskar was required to show that that Hurd and Jenkins "intentionally or recklessly" made the purported omission. *Id.* Here, the record

shows that Hurd and Jenkins are auditors (not law enforcement officers) who were tasked with conducting an audit into a financial issue (not a criminal investigation). And during that audit, they reviewed thousands of documents and interviewed various Georgia Tech officials who informed them that Laskar's conduct was improper. Did Hurd and Jenkins act "intentionally or recklessly" in failing to investigate whether other professors and startups had engaged in similar conduct?

2. Laskar must also show that the omission was "material." *Paez v. Mulvey*, 915 F.3d 1276, 1287 (11th Cir. 2019). An omission is "material" when "probable cause would be negated if … the omitted information [is] included." *Id.* The existence of a potential affirmative defense does not negate probable cause. *Id.* at 1286. Here, the racketeering charges against Laskar were based on false statements and theft. In particular, he was accused of lying about his involvement and interest in Sayana on conflict-of-interest forms he submitted to Georgia Tech and of causing Georgia Tech to pay for chips from an overseas company that he then delivered to a different company. Laskar admits to all of these facts. Was Hurd and Jenkins' alleged omission "material"?

3. The chain of causation is severed when an officer conducts an independent investigation and independently reaches the decision to obtain an arrest warrant. *See, e.g.*, *Carter v. City of Melbourne*, 731 F.3d 1161, 1170 (11th Cir. 2013). Here, GBI conducted an independent criminal investigation into Laskar and Sayana's conduct and independently reached the conclusion that probable cause existed to arrest Laskar for racketeering. Did the independent nature of the criminal investigation sever the causal chain?

4. When the plaintiff is detained for only a brief period, the "validity of the warrants for [the plaintiff's] arrest [is] … immaterial." *Harris v. Hixon*, 102 F.4th 1120, 1135 (11th Cir. 2024). Laskar was detained in jail for approximately seven hours. Is the validity of his arrest warrant immaterial?

5. Was the law "clearly established" that Hurd and Jenkins violated the Fourth Amendment?

## INTRODUCTION

This malicious prosecution appeal arises from the arrest and prosecution of Plaintiff-Appellant Joy Laskar (who was, at the time, a Georgia Tech professor) for racketeering. The gravamen of the racketeering charges was that Laskar's private company, Sayana, used Georgia Tech facilities to design and develop a microchip. Laskar then caused Georgia Tech (and not Sayana) to pay for the fabrication of the chips by an overseas company. After Sayana tested and conducted research on the fabricated chips (which Georgia Tech now owned by virtue of paying for them), it delivered the chips to a different company for a profit.

The judge who presided over Laskar's criminal case ultimately dismissed the racketeering charges. Not because they were unfounded or lacked probable cause, but because they were time-barred by the statute of limitations. Laskar then filed suit under 42 U.S.C. § 1983 for malicious prosecution in violation of the Fourth Amendment.

Laskar did not sue the GBI agent and assistant attorney general who initiated and conducted the criminal investigation and obtained the arrest warrant against him. Instead, Laskar filed suit against two Georgia Tech auditors (Defendant-Appellees Phillip Hurd and Patrick Jenkins) who, while conducting an audit

into a financial issue at the university, discovered and reported "potential malfeasance" by Laskar to an official at the University System of Georgia. Hurd and Jenkins were not involved in the decision to institute a criminal investigation against Laskar, nor did they participate in GBI's subsequent criminal investigation aside from providing it with documents and sitting in on interviews. They also were not involved in GBI's decision to arrest Laskar for racketeering, nor did they assist in drafting the arrest warrant against Laskar.

Hurd and Jenkins moved for summary judgment on Laskar's malicious prosecution claim, which the district court granted because no Fourth Amendment violation occurred and qualified immunity applied. That decision was correct, and this Court should affirm.

Laskar's theory in this case is that Hurd and Jenkins should have expanded the scope of their financial audit to include an investigation into whether other professors and startups had engaged in similar conduct, and that this failure was an omission necessary to support the arrest warrant. To prevail on this theory, Laskar was required to establish (among other things) that Hurd and Jenkins "intentionally or recklessly" made the omission. *Williams v. Aguirre*, 965 F.3d 1147, 1165 (11th Cir.

2020). He was also required to establish that the omission was "material" in that "probable cause would be negated if … the omitted information [is] included." *Paez v. Mulvey*, 915 F.3d 1276, 1287 (11th Cir. 2019). Laskar failed to carry this burden for multiple reasons.

As an initial matter, there is no evidence Hurd and Jenkins acted "intentionally or recklessly." Hurd and Jenkins's audit was extensive—they reviewed thousands of documents and spoke with Georgia Tech officials, who advised them that Laskar's conduct was improper. While Laskar may wish that Hurd and Jenkins had done *more*, they were not required to do so. Hurd and Jenkins are not law enforcement officers, and they were conducting an audit into a financial matter, not a criminal investigation. And, in any event, not even law enforcement officers are required to investigate a suspect's potential defenses. *Davis v. City of Apopka*, 78 F.4th 1326, 1336 (11th Cir. 2023).

Laskar also cannot show that Hurd and Jenkins' omission was "material" because there is ample evidence to support probable cause or, at the very least, arguable probable cause. The arrest warrant accused Laskar of engaging in racketeering activity by: (1) making false statements on the conflict of interest forms he submitted to Georgia Tech, and (2) using Georgia Tech

funds to pay a company to fabricate chips that Sayana then tested and sent to a different company for a profit. Laskar admits *all* of this. And he has not come forward with evidence to corroborate his theory that other Georgia Tech professors and startup companies engaged in similar false statements and acts of theft. But even if he could, this is merely a potential defense to the criminal charges, which does not negate probable cause. *See, e.g.*, *Rickerson v. Jeter*, 2022 U.S. App. LEXIS 16364, *9 (11th Cir. 2022) (collecting cases showing that this Court "has repeatedly held that the existence of facts that give rise to an affirmative defense does not defeat probable cause, actual or arguable").

Laskar's malicious prosecution claim fails for the additional reason that the GBI agent and assistant attorney general conducted a separate, independent criminal investigation that was substantially more extensive than the Georgia Tech audit and then *independently* formed their own conclusions about Laskar's conduct and whether probable cause existed to arrest him. In doing so, the GBI agent and assistant attorney general severed the causal chain in this case. *Carter v. City of Melbourne*, 731 F.3d 1161, 1170 (11th Cir. 2013). Additionally, Laskar was detained for only seven hours, and so the validity of the arrest

warrant is "immaterial." *Harris v. Hixon*, 102 F.4th 1120, 1135 (11th Cir. 2024).

Finally, even if there were some sort of constitutional violation here—and there decidedly is not—Laskar has not identified any cases that "clearly establish" that Hurd and Jenkins acted unlawfully. There are no pre-existing cases from this Court or the Supreme Court that involve circumstances even remotely similar to the facts here—i.e., where the plaintiff sues individuals who are not law enforcement officers, did not conduct a criminal investigation, did not conclude that the plaintiff had committed a crime, and played no role in deciding to obtain arrest warrants against the plaintiff.

This Court should affirm.

## STATEMENT OF THE CASE

Laskar sued Hurd and Jenkins for malicious prosecution under the Fourth Amendment. Hurd and Jenkins moved for summary judgment based on Laskar's failure to prove a malicious prosecution claim, as well as qualified immunity, and the district court granted the motion. Laskar appeals here.

## A. Factual Background

### 1. Laskar and Sayana

In 1995, Georgia Tech hired Plaintiff-Appellant Joy Laskar as a professor of electrical and computer engineering. Doc. 89-1 at 13, 14. Laskar was also the co-founder, president, chief executive officer, manager, and chairman of the board of managers of a private company called "Sayana Wireless." *Id.* at 77. The purpose of Sayana was to design and develop high frequency microchips for potential use in wireless technology. *Id.* at 81; Doc. 87-3 at 5. Sayana outsourced the fabrication of these chips to a French company called Circuits Multi-Projets. Doc. 89-1 at 82–83.

### 2. Georgia Tech's Conflict of Interest Policy

Georgia Tech's Faculty Handbook contains a conflict-of-interest policy that applies to all Georgia Tech employees. Doc. 87-3 at 6–7. The policy cites Georgia's conflict of interest law governing state employees, O.C.G.A. § 45-10-23, and states that "[i]t shall be unlawful for any Full-time Employee, for himself or herself, or on behalf of any Business, or for any Business in which such employee or member of his or her family has a Substantial Interest, to Transact Business with the agency by which such employee is employed." *Id.* at 7. The policy, in turn, defines "substantial interest" as having a more than 25% ownership in a

business. *Id.* Additionally, in its definition of "conflict of interest," the policy gives the following example of a situation that poses a conflict: when an employee "has a significant financial interest in a business which transacts business with the Institute." *Id.* Under the policy, every employee who participates in outside professional activities or sponsored research where a "potential conflict exists" is required to file an annual conflict of interest form and to update the form when the reported facts change. *Id.*

Between 2007 and 2010, Laskar's ownership interest in Sayana was approximately 42.5%. *Id.* at 6. During this time period, he submitted the following conflict of interest forms to Georgia Tech:

- In July 2007, Laskar reported that he did not have any relationships, commitments, or activities that might present or appear to present a conflict of interest with his Georgia Tech appointments. *Id.* at 266. Laskar reported that he was merely an advisor to Sayana. *Id.*
- In July 2008, Laskar again reported that he did not have any relationships, commitments, or duties that might present or appear to present a conflict of interest. *Id.* at

269. Laskar reported that he was a co-founder of and advisor to Sayana. *Id.* at 269–70.

- In an undated electronic form, Laskar reported that he had no outside business activities related to his responsibilities at Georgia Tech. *Id.* at 271–73.

In these forms, Laskar failed to disclose that he was the president and chief executive officer of Sayana, that he had a significant ownership interest in Sayana, and that his position and ownership in Sayana presented a conflict of interest.

### 3. Hurd and Jenkins' Audit

In December 2009, Georgia Tech officials identified an accounts receivable shortfall of more than $600,000 relating to activities at the Georgia Electronic Design Center, a research center at Georgia Tech that allows private technology companies to collaborate with Georgia Tech researchers in exchange for paying membership dues. *Id.* at 3. Laskar was, at the time, serving as the Design Center's director. Doc. 89-1 at 19–20.

As a result of the shortfall, Georgia Tech contacted Hurd (Georgia Tech's Director of Internal Auditing) and requested that he conduct an audit. Doc. 87-3 at 3–4. Georgia Tech asked Hurd to "conduct a study of [the] issue, determine whether or not the

funds were double-spent, [and] if so, identify why, and identify appropriate changes and controls that will prevent these issues from occurring in the future." *Id.* at 19.

Hurd oversaw the audit, and Jenkins (a senior IT auditor) served as part of the team, which included eight auditors. *Id.* at 4. As part of the audit, the audit team reviewed thousands of pages of emails, financial records, contracts, and other documents. *Id.* They also worked with Georgia Tech's cybersecurity department to "image" the computer hard drives of several Georgia Tech employees and retrieve emails from Georgia Tech's email service. *Id.* The audit team also interviewed various officials and financial staff at Georgia Tech and the Georgia Tech Research Corporation. *Id.* at 4, 13.

The audit team learned several significant pieces of information about Laskar and Sayana during the audit. They learned that, prior to April 2009, Sayana did not pay for any of the chips that Circuits Multi-Projets fabricated. *Id.* at 10. Instead, Sayana submitted Circuit Multi-Projet's invoices for the chip orders to the Design Center's accounting staff. *Id.* at 11. In doing so, Georgia Tech—and not Sayana—paid over one million dollars for chips. *Id.* The audit team also learned that Sayana had entered into several agreements with a government-funded

research institute in South Korea called the Electronics and Telecommunications Research Institute. *Id.* at 10. Those agreements required Sayana to design, develop, and conduct research on the chips; provide research reports to ETRI; and send the chips to ETRI as "deliverables." *Id.* ETRI would then pay Sayana after ETRI verified the results set forth in Sayana's research reports. *Id.* The audit team learned that, consistent with these agreements, Sayana had been obtaining fabricated chips from Circuit Multi-Projets and then sending those chips to ETRI, even though Georgia Tech paid for the chips and title to the chips was never transferred from Georgia Tech to Sayana. *Id.* at 10–11.

The audit team also learned that Sayana did not pay any membership dues to the Design Center until February 20, 2009. *Id.* Despite that, Sayana employees had been using Georgia Tech office space, chip design software, equipment, and laboratory facilities at the Design Center since at least early 2007. *Id.* at 12. Sayana did not have a lease agreement or contract with Georgia Tech to use its office space, software, equipment, or laboratories. *Id.* And Sayana employees were using Georgia Tech facilities at times when the facilities were being used by Georgia Tech employees and students. *Id.* Jenkins reviewed the user logs for

Cadence chip design software and found that three Sayana employees were regularly using that software, which Georgia Tech held the license for. *Id.* Additionally, the audit team learned that Sayana employees were using equipment at the Design Center to develop and test chips for Sayana's business. *Id.*

Near the end of the audit, Hurd (and other university officials) met with Laskar, who confirmed that Sayana was using office space at a Georgia Tech owned facility. *Id.* Laskar also confirmed that Sayana tested its chips at Georgia Tech's laboratories and facilities. *Id.* Laskar stated that for startup chip companies like Sayana, one of the largest costs is chip design software and so Sayana used the Cadence chip design software licensed by Georgia Tech. *Id.* at 13. During the meeting, Laskar was confronted about the fact that, under Georgia's conflict of interest law, Georgia Tech professors "aren't supposed to own more than 25% of companies if those companies do business with the institution." *Id.* Laskar responded that "I guess, to be fair, technically I violate that, because there is interaction between Sayana and Georgia Tech." *Id.* Laskar further stated: "It is true … that Sayana does business with Georgia Tech … even if there's no funding coming from the company to the university, if we use [Georgia Tech] space." *Id.*

### 4. Hurd's Report of Suspected Malfeasance

The University System of Georgia has a policy that requires all institutions, including Georgia Tech, to "report all *suspected* malfeasance" to the Office of Internal Audit. *Id.* at 13–14 (emphasis added). Thus, after the conclusion of the audit, Hurd prepared and sent a document titled "Official Report of Suspected Malfeasance" to the Chief Audit Officer and Associate Vice Chancellor for the University System, John Fuchko, III. Doc. 87-3 at 22–26. The report summarized the audit team's findings and expressed concerns about the conduct of several Georgia Tech employees, including Laskar. *Id.* With respect to Laskar, the report listed the following instances of "*potential* malfeasance":

- Laskar misrepresented his role in Sayana in his annual conflict of interest statements to Georgia Tech. In those statements, he claimed to be only an "advisor" to Sayana when in fact he was the president and chief executive officer and possessed a substantial ownership interest.
- Sayana did not pay membership dues to Tech's Design Center until 2009. Yet, Sayana used Georgia Tech's offices, equipment, laboratory facilities, and resources to operate its business since 2007.

- Georgia Tech paid for the purchase of Sayana's chips from Circuits Multi-Projets, which were improperly invoiced through the Design Center.
- Laskar's ownership in Sayana, and the company's business activities at Georgia Tech, appeared to violate O.C.G.A. § 45-10-23, which is the civil statute that governs state employees' conflicts of interest.

*Id.* The report did not conclude that Laskar had committed a crime, nor did it recommend the initiation of a criminal investigation or criminal proceedings against Laskar. *Id.*

### 5. GBI's Criminal Investigation into Laskar and Sayana.

John Fuchko sent the report to Senior Assistant Attorney General David McLaughlin, the chief prosecutor at the Georgia Department of Law, based on a mandatory reporting policy. *Id.* at 14. AAG McLaughlin, in turn, sent a letter to the Director of the Georgia Bureau of Investigation to request a criminal investigation into Laskar and Sayana's activities. Doc. 87-6 at 2. Agent Lisa Vorrasi was GBI's lead case agent on the investigation. Doc. 87-5 at 3.

When GBI opened the criminal investigation, Georgia Tech's president instructed Hurd to make himself and the rest of the

audit team available to Agent Vorrasi and AAG McLaughlin and to provide them with documents and information upon their request. Doc. 87-3 at 15. Hurd therefore placed the audit team on "litigation support" status for the duration of the criminal investigation. *Id.*

In May 2010, Agent Vorrasi obtained and executed search warrants at Georgia Tech facilities, as well as Laskar's home, vehicle, and person. Doc. 87-5 at 3, 18–39. This resulted in the seizure of a large body of evidence, including Sayana computers and business records, which amounted to thousands of documents. *Id.* at 4. Over the next four months, AAG McLaughlin and Agent Vorrasi, along with other agents, reviewed the seized evidence. *Id.* GBI agents also interviewed Georgia Tech employees, and AAG McLaughlin deposed Sayana employees. *Id.*

At the close of the criminal investigation, Agent Vorrasi and AAG McLaughlin determined that probable cause existed to arrest Laskar for racketeering in violation of O.C.G.A. § 16-144(a) and (b). *Id.* at 5. The predicate acts for the racketeering were: (1) making false statements, and (2) committing multiple thefts. *Id.* As to the false statements, Agent Vorrasi and AAG McLaughlin concluded that Laskar misrepresented his relationship with Sayana on his Georgia Tech conflict of interest forms by

concealing his ownership interest in the company. *Id.* And as to the thefts, Agent Vorrasi and AAG McLaughlin concluded that Laskar caused Georgia Tech to make the following payments to Circuits Multi-Projets for chips: $60,139.70 on November 7, 2006; $138,119 on May 21, 2007; $147,000 on April 15, 2008; $30,423 on August 25, 2008; $224,297 on September 18, 2008; $248,328.37 on November 14, 2008; $143,050.90 on January 29, 2009; $48,310.40 on March 10, 2009; and $50,000 on January 6, 2010. *Id.* at 5–6. They further concluded that Sayana took possession of and used the chips—which Georgia Tech had paid for and, hence, were Georgia Tech's property—for its own benefit and then sent the chips to ETRI. *Id.* at 6.

Before seeking an arrest warrant, AAG McLaughlin consulted with officials at Georgia Tech (other than Hurd and Jenkins), who advised him that Laskar and Sayana's business activities at the Design Center, and use of Georgia Tech resources, violated Georgia Tech's policies. Doc. 87-6 at 6.

On September 22, 2010, Agent Vorrasi obtained warrants for Laskar's arrest, which she drafted with the assistance of AAG McLaughlin. Doc. 87-5 at 5. The arrest warrant affidavits were based on GBI's investigation, AAG McLaughlin and Agent Vorrasi's independent review of the evidence, and their own

conclusions based on that evidence. *Id.* at 6. Hurd and Jenkins did not have any involvement in preparing the arrest warrant affidavits. *Id.* Nor did they dictate or have any involvement in deciding whether to arrest Laskar, what crimes would be included in the arrest warrant affidavits, or whether probable cause existed for those crimes. *Id.*

AAG McLaughlin entered into a consent bond agreement with Laskar's criminal attorney before the arrest warrants were executed. Doc. 87-6 at 6. Pursuant to the agreement, Laskar voluntarily appeared at the Fulton County Jail on September 24, 2010, to be processed and to pay his bond. *Id.* He arrived at the Fulton County Jail around 9:00 a.m. and was in jail for approximately seven hours from 10:00 a.m. to 5:00 p.m. Doc. 89-1 at 230, 232.

On December 30, 2014, AAG McLaughlin presented an indictment for Laskar to a grand jury. Doc. 87-6 at 6–7. The grand jury returned a true bill and charged Laskar with two counts of racketeering in violation of O.C.G.A. § 1614-4(a) and (b). *Id.* at 7. Hurd and Jenkins did not testify before the grand jury. Doc. 87-3 at 16.

Two years later, a superior court judge ruled that the statute of limitations barred the charges against Laskar and, thus,

dismissed them. Doc. 87-6 at 7. At no point in the criminal proceedings did the judge rule that there was no probable cause to arrest and charge Laskar for racketeering. *Id.*

### 6. Laskar's Termination from Georgia Tech

Laskar was suspended from his position at Georgia Tech on May 17, 2010. Doc. 89-1 at 253. Shortly thereafter, a termination hearing was held before a committee of four faculty members, all of whom were engineers. Doc. 87-7 at 3. After roughly twelve hours of testimony and argument, the committee concluded that Laskar improperly used Georgia Tech monies and resources to benefit his private company. *Id.* at 3–4. Specifically, it concluded that: Laskar caused Georgia Tech to pay for chips from Circuits Multi-Projets that Sayana then used to satisfy its contracts with ETRI; title to these chips was never transferred to Sayana; Laskar fabricated a $50,000 quote for a July 2007 chip run; Laskar misled a Georgia Tech official into approving the $50,000 invoice; Laskar failed to disclose the full extent of his involvement in Sayana to Georgia Tech in his annual conflict of interest forms; and Laskar improperly "divert[ed] Georgia Tech resources to benefit Sayana" by using Georgia Tech's offices, lab space, equipment, and IT resources for Sayana's own business and without Georgia Tech authorization. *Id.*

The committee therefore submitted a report to Georgia Tech's president that unanimously recommended Laskar's dismissal. *Id.* at 3. The president agreed with the recommendation and revoked Laskar's tenure and terminated his employment. *Id.* at 5. Laskar appealed the president's decision to the Board of Regents of the University System of Georgia, but the Board upheld the decision. *Id.*

**B. Proceedings Below**

Laskar sued Hurd and Jenkins under 42 U.S.C. § 1983 for malicious prosecution in violation of the Fourth Amendment.[1] Docs. 1, 19. Hurd and Jenkins moved to dismiss for failure to state a claim. Doc. 20. They argued that, because the prosecution against Laskar was dismissed as time-barred, he could not show a "favorable termination," which is a required element in a malicious prosecution claim. *Id.* The district court agreed and granted the motion. Doc. 30. This Court, however, reversed, concluding that "a dismissal for untimeliness qualifies as a

---

[1] He also sued Jilda Garton (Tech's Associate Vice Provost for Research) and Mark Allen (Tech's Senior Vice Provost for Research and Innovation), who requested an audit of the $650,000 overrun. Doc. 19. The trial court dismissed the claims against Garton and Allen, and this Court affirmed. *Laskar v. Hurd*, 972 F.3d 1278, 1297 (11th Cir. 2020). Thus, Laskar's claims against these two officials are not at issue in this appeal.

favorable termination." *Laskar v. Hurd*, 972 F.3d 1278, 1282 (11th Cir. 2020).

Upon remand, the parties conducted extensive discovery. Hurd and Jenkins then moved for summary judgment based on qualified immunity. Doc. 87. They argued, among other things, that: (1) Laskar could not prove a Fourth Amendment violation because they did not make any intentional or reckless misstatements or omissions necessary to support the arrest warrant, and (2) the law was not "clearly established" that their conduct violated the Fourth Amendment. Doc. 87-1 at 29–30, 32–35.

The district court granted summary judgment in Hurd and Jenkins' favor. Doc. 120. It concluded that, because AAG McLaughlin and Agent Vorrasi conducted an independent investigation, Hurd and Jenkins' "statements were not necessary to support the warrant." *Id.* at 16. The district court further concluded that Hurd and Jenkins did not "intentionally or recklessly [make] misstatements or omissions." *Id.* at 13. In reaching this conclusion, the district court reasoned that "the record evidence does not support that any information presented was intentionally false" and that, even if Hurd and Jenkins' audit could have been "more robust," this was "at most merely

negligen[ce].” *Id.* at 15. The district court also concluded that the arrest warrant contained sufficient information to establish probable cause. *Id.* at 15–16. Finally, the district court concluded that the law was not “clearly established” because the circumstances in this case are “noticeably different from” the circumstances in pre-existing caselaw in that Hurd and Jenkins were not law enforcement officers conducting a criminal investigation. *Id.* at 21.

### C. Standard of Review

This Court reviews a grant of summary judgment based on qualified immunity *de novo*. *Luke v. Gulley*, 50 F.4th 90, 95 (11th Cir. 2022).

## SUMMARY OF ARGUMENT

This Court should affirm the grant of summary judgment to Hurd and Jenkins for five reasons.

*First*, to prevail on his malicious prosecution claim, Laskar was required to establish that Hurd and Jenkins’ omission was “intentional or reckless” as opposed to merely negligent. *Paez*, 915 F.3d at 1287. This he cannot do. During the audit, Hurd and Jenkins obtained and reviewed a slew of documents and spoke with various Georgia Tech officials, who advised them that

Laskar's conduct was improper. Nothing about this exhibits an intentional or reckless disregard for the truth. Especially since Hurd and Jenkins are not law enforcement officers, and the purpose of their audit was to determine the cause of a financial shortfall at Georgia Tech, not to conduct a thorough investigation into whether Laskar had committed a crime. In fact, even police officers do not have a duty to investigate a suspect's affirmative defenses to a crime. *Davis v. City of Apopka*, 78 F.4th 1326, 1336 (11th Cir. 2023).

*Second*, Laskar cannot show that Hurd and Jenkins' omission was "material" in that "probable cause would be negated if … the omitted information [is] included." *Paez*, 915 F.3d at 1287. The racketeering charges against Laskar were based on false statements and theft. In particular, he was accused of lying about his involvement and interest in Sayana on his conflict-of-interest forms and of causing Georgia Tech to pay for chips from an overseas company that he then delivered to a different company. Laskar does not deny any of this. As a result, there was probable cause—and certainly arguable probable cause—to believe Laskar had made false statements and engaged in theft. To the extent that other professors and startup companies engaged in similar conduct, this is merely a *defense* to the criminal charges. And this

Court has repeatedly held that the existence of a potential affirmative defense does not negate probable cause. *See, e.g.*, *Paez*, 915 F.3d at 1286.

*Third*, Laskar cannot establish a causal connection between Hurd and Jenkins' omission and his arrest. The record shows that Agent Vorrasi and AAG McLaughlin conducted an *independent* investigation into Laskar's conduct and then formed their own conclusions about whether Laskar had committed a crime and whether to take out a warrant for his arrest. The separate, independent nature of GBI's criminal investigation severed the chain of causation in this case. *See, e.g.*, *Carter v. City of Melbourne*, 731 F.3d 1161, 1170 (11th Cir. 2013).

*Fourth*, when a plaintiff is detained for a brief period, the "validity of the warrants [for his arrest] is *immaterial*." *Harris v. Hixon*, 102 F.4th 1120, 1133–36 (11th Cir. 2024). Because Laskar was detained in jail for only seven hours, the validity of his arrest warrant is immaterial. He therefore cannot base his malicious prosecution claim on an alleged constitutional infirmity in his arrest warrant.

*Fifth*, even if a constitutional violation occurred, Laskar identifies no materially similar case showing that Hurd and Jenkins' conduct, as shown by the evidence in this case, violates

"clearly established" law. Nor can he. There are no cases from the Supreme Court that have imposed liability in anything remotely resembling the facts here. This is not a close question, and the Court should affirm.

## ARGUMENT

Qualified immunity gives government officials "breathing room to make reasonable but mistaken judgments" and "protects all but the plainly incompetent or those who knowingly violate the law." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011). Government officials who act within their discretionary authority are entitled to qualified immunity unless: (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was "clearly established." *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018). Because Laskar does not contest that Hurd and Jenkins acted within their discretionary authority, he bears the burden of proving they are not entitled to qualified immunity. *Williams*, 965 F.3d at 1156–57.

Laskar has failed to carry that burden. As explained below, Hurd and Jenkins did not violate the Fourth Amendment. Alternatively, any wrongdoing on their part was not "clearly established." Either way, qualified immunity protects Hurd and Jenkins from liability, and this Court should affirm.

## I. Hurd and Jenkins did not commit malicious prosecution in violation of the Fourth Amendment.

The term "malicious prosecution" is "a bit of a misnomer" in that it has nothing to do with the validity of the plaintiff's criminal prosecution. *Gervin v. Florence*, 139 F.4th 1236, 1267 (11th Cir. 2025) (Wilson, J., concurring). "Malicious prosecution" is instead "shorthand for a claim of deprivation of liberty pursuant to legal process." *Id.* at 1252. In other words, what matters in a malicious prosecution claim is whether "the [plaintiff's] *seizure* was justified, not whether the *prosecution* itself was justified." *Id.* at 1267 (emphasis added).

To prevail on his malicious prosecution claim, Laskar was required to establish four elements: (1) he was seized under legal process; (2) the legal process justifying his seizure was constitutionally infirm; (3) the suit or proceeding terminated in his favor; and (4) the seizure would not otherwise be justified without legal process. *Id.* at 1248. Only the second and fourth elements are at issue in this appeal.

As for the second element, an arrest warrant is "constitutionally infirm" if "the officer who applied for the warrant should have known that his application failed to establish probable cause" or "an official, including an individual who did not apply for the warrant, intentionally or recklessly made

misstatements or omissions necessary to support the warrant." *Williams*, 965 F.3d at 1165. Because Hurd and Jenkins did not apply for Laskar's arrest warrant, Doc. 87-5 at 6, Laskar must prove that they "intentionally or recklessly made misstatements or omissions necessary to support the warrant."[2] *Id.* He must then prove that the purported misstatement or omission was "material" by showing that "probable cause would be negated if the offending statement was removed or the omitted information included." *Paez*, 915 F.3d at 1287.

Laskar cannot establish any of this for at least four reasons. *First*, Hurd and Jenkins did not "intentionally or recklessly" make a misstatement or omission necessary to support the arrest warrant. *Second*, probable cause exists for Laskar's arrest even when the alleged misstatement or omission is corrected. *Third*, Agent Vorrasi and AAG McLaughlin's independent investigation severed the causal chain. *Fourth*, Laskar cannot show that his seizure "would not otherwise be justified without legal process."

---

[2] Laskar argues on appeal that the arrest warrant was "constitutionally infirm" because Agent Vorrasi should have known that the affidavit she drafted in support of the arrest warrant was flawed. Br. at 25–27. But Agent Vorrasi is not a defendant in this lawsuit. As a result, this first method of showing a constitutional infirmity is out of the picture.

### A. Hurd and Jenkins did not "intentionally or recklessly" make a misstatement or omission.

The burden of establishing that Hurd and Jenkins "intentionally or recklessly" made a misstatement or omission (i.e., made a false statement or withheld information) necessary to support the arrest warrant rests on Laskar. *Williams*, 965 F.3d at 1165. This requires him to identify "affirmative evidence from which a jury could find" that Hurd and Jenkins either "intentionally lied to or recklessly misled" Agent Vorrasi and AAG McLaughlin. *Id.* Conclusory allegations and speculation are not sufficient. *Id.* And no liability exists if Hurd and Jenkins' misstatement or omission was merely negligent—i.e., was a "mistaken belief." *Id.*; *see also Paez*, 915 F.3d at 1287 ("Negligent misstatements or omissions … do not [violate the Fourth Amendment.").

Laskar's theory in this case is that Hurd and Jenkins should have expanded the scope of their audit to "include a comparison of other faculty members and their startups." Br. at 4. He contends that their failure to do so constitutes an intentional or reckless omission.[3] *Id.* The evidence in the record, however, does not

[3] Although Laskar refers to the limited scope of the audit as an "omission," that is a misnomer. This is not a situation where Hurd and Jenkins *actually knew* exculpatory information and then omitted it. To that end, it is unclear whether Hurd and

support this theory. The audit Hurd and Jenkins conducted for Georgia Tech was extensive: they reviewed "thousands of pages" of emails, financial records, contracts, and other documents; inspected the hard drives of several Georgia Tech employees; met with Laskar; and interviewed multiple Georgia Tech officials and financial staff. Doc. 87-3 at 4, 12. They even consulted with officials at Georgia Tech and the Georgia Tech Research Corporation, all of whom advised them that Laskar's conduct was "improper and in violation of Georgia Tech policy." *Id.* at 12. None of this is evidence of intentional or reckless wrongdoing. To the contrary, these facts show that Hurd and Jenkins went to great pains to conduct a detailed, accurate audit.

Laskar's theory here is, in essence, that Hurd and Jenkins failed to conduct a thorough investigation. Br. at 4. But context is crucial. Hurd and Jenkins were not law enforcement officers charged with conducting a criminal investigation into whether Laskar had committed a crime. Rather, they were auditors tasked with conducting an audit to determine the cause of a financial issue.[4] Doc. 87-3 at 3, 19. They did not conclude that Laskar had

---

Jenkins committed an "omission" that could potentially give rise to liability.

[4] The audit request that Hurd and Jenkins received asked them to "conduct a study of this [financial] issue, determine whether or

committed a crime, nor did they request the initiation of a criminal investigation. *Id.* at 22–26. Instead, they merely summarized the audit findings in a "report of *suspected* malfeasance"—which an internal policy required them to prepare—and sent that report to the Associate Vice Chancellor for Internal Audit. *Id.* at 13–14, 22 (emphasis added).

Significantly, Laskar has not "pointed to any evidence that [Hurd and Jenkins] had or were shown but refused to consider." *Harris v. Hixon*, 102 F.4th 1120, 1129 (11th Cir. 2024). Likewise, he has not "pointed to any readily available evidence that they knew about or were provided that would have plainly, obviously, and irrefutably exonerated him." *Id.* Laskar instead merely "points to additional steps in the investigation that he thinks would have been useful for them to perform," but these "investigative suggestions are not evidence of a constitutional violation." *Id.*

Regardless, not even law enforcement officers would have been required to investigate other professors and startups. This is because law enforcement officers do not have an "affirmative

---

not the funds were double-spent, if so, identify why, and identify appropriate changes and controls that will prevent these issues from occurring in the future." Doc. 87-3 at 13.

obligation to seek out exculpatory information of which the officer is *not* aware." *Kelly v. Curtis*, 21 F.3d 1544, 1551 (11th Cir. 1994) (emphasis in original). Stated differently, law enforcement officers "need not take every conceivable step … to eliminate the possibility of convicting an innocent person." *Rankin v. Evans*, 133 F.3d 1425, 1436 (11th Cir. 1998).

The bottom line is that Hurd and Jenkins were auditors trying to determine the cause of a financial shortfall at Georgia Tech. They were not required to conduct a full-scale investigation into the conduct of other professors and their start-up companies. Laskar therefore cannot show that Hurd and Jenkins acted with the requisite intentionality or recklessness. His malicious prosecution claim fails for this reason alone.

### B. The omitted information, if included in the arrest warrant, would not negate probable cause.

Even if Hurd and Jenkins intentionally or recklessly omitted information (and they did not), the legal analysis does not end there. Laskar must also show that the omitted information was "material"—i.e., that it would have negated probable cause. *Paez*, 915 F.3d at 1287. Moreover, because this is a qualified immunity case, he must show that the omitted information would have

negated *arguable* probable cause. *Id.* at 1288. He has failed to do so.

Arguable probable cause exists if "a reasonable officer *could have* believed an offense was committed." *Id.* (emphasis in original). And any reasonable officer looking at the facts in this case could have—and would have—believed Laskar had engaged in racketeering activities. The basis for the racketeering charge was two-fold: (1) Laskar made false statements about his involvement and interest in Sayana on his conflict-of-interest forms, and (2) he engaged in acts of theft when he caused Georgia Tech to pay for Circuits Multi-Projets' fabricated chips. Doc. 87-5 at 5–6, 320.

Ample evidence exists to support both accusations. In 2007, Laskar stated in his conflict-of-interest form that he was merely an advisor to Sayana and that he did not have any relationships, commitments, or activities that might present or appear to present a conflict of interest with his Georgia Tech appointments. Doc. 87-3 at 8. Laskar then provided the same information in his 2008 form, adding only that he was also a co-founder of Sayana. *Id.* The reality, however, was that Laskar possessed a 42.5% interest in Sayana and was its president, chief executive officer, manager, and chairman of the board of managers. *Id.* at 6.

Additionally, the evidence shows that Georgia Tech paid for chips fabricated by Circuits Multi-Projets, which amounted to around one million dollars. *Id.* at 10. Sayana then tested and conducted research on those chips and delivered them to ETRI, the South Korean research institute, for a profit. *Id.* at 12–13.

Based on these facts—all of which Laskar has admitted to—there was probable cause and, at a minimum, arguable probable cause to believe Laskar had made false statements and engaged in theft by taking. None of this changes when the omitted information (i.e., that other Georgia Tech professors allegedly engaged in similar conduct with their start-up companies) is factored into the equation. As an initial matter, Laskar has not shown that the omitted information is actually true. He has not come forward with evidence that other professors lied on their conflict-of-interest forms. Nor has he come forward with evidence that other startup companies were causing Georgia Tech to pay for items that those companies then sold for a profit.[5]

---

[5] He also has not come forward with actual evidence (i.e., something more than unsupported conclusory allegations) that any other professor was operating his or her private company out of Georgia Tech offices, and using its chip design software and laboratory space, when that professor had a substantial ownership interest in the company, which violates university policy and Georgia's conflict of interest law for state employees.

But even assuming for the sake of argument that other professors *were* engaging in similar conduct, this would merely be a potential defense to the criminal charges. And law enforcement officers are not required to "understand the nuances of any possible defense, or answer them in order to decide whether there was probable cause." *Paez*, 915 F.3d at 1290. Indeed, this Court "has repeatedly held that the existence of facts that give rise to an affirmative defense does not defeat probable cause, actual or arguable." *Rickerson v. Jeter*, 2022 U.S. App. LEXIS 16364 (11th Cir. 2022) (collecting cases). So even if other professors had engaged in similar conduct, arguable probable cause still exists to believe that Laskar made false statements and stole Georgia Tech property.

### C. Laskar cannot establish a causal connection between the audit and his arrest.

Causation is a required element for every § 1983 claim. *Brown v. City of Huntsville, Ala.*, 608 F.3d 724, 737 (11th Cir. 2010); *see also Baker v. McCollan*, 443 U.S. 137, 142 (1979) ("[A] public official is liable under § 1983 only if he *causes* the plaintiff

---

Laskar owned more than 25% of Sayana, and so Sayana was not permitted to have *any* business interaction with Georgia Tech, period.

to be subjected to [a] deprivation of his constitutional rights."). In the context of malicious prosecution, causation exists when the defendant's misstatement or omission was "material to [the plaintiff's] seizure pursuant to legal process." *Laskar*, 972 F.3d at 1297. As noted above, a misstatement or omission is "material" when probable cause "would be negated if … the omitted information [is] included." *Paez*, 915 F.3d at 1287. Causation is therefore lacking in this case for the same reasons set forth above.

Additionally, a causal connection can plainly be severed when the officer who applies for the warrant conducts an independent investigation. For example, in *Carter v. City of Melbourne*, 731 F.3d 1161 (11th Cir. 2013), this Court determined that no causation existed because the Florida Department of Law Enforcement "conducted its own investigation and independently decided to arrest and detain [the plaintiff]," and there was no evidence that the defendants "caused the [department] to … arrest, detain, or charge [the plaintiff] by knowingly supplying false information to the [department] or placing undue pressure on the [department]." *Id.* at 1170.

Just so here. Agent Vorrasi and AAG McLaughlin independently reviewed the same documents and evidence that

Hurd and Jenkins reviewed during the audit, and then they did *even more*. Specifically:

- Agent Vorrasi and AAG McLaughlin reviewed "thousands of documents" that they obtained through search warrants, including Sayana's business records and documents from Sayana's computers. Doc. 87-5 at 3.
- AAG McLaughlin took the depositions of several Sayana employees. Doc. 87-6 at 4.
- AAG McLaughlin consulted with officials at both Georgia Tech and the Georgia Tech Research Corporation, who advised him that Laskar and Sayana's business activities violated Georgia Tech's policies. *Id.* at 6.

When Agent Vorrasi and AAG McLaughlin later decided to obtain an arrest warrant against Laskar, they did so based on this expansive criminal investigation, their "*independent* review of the evidence, and [their] *own* conclusions based on that evidence." *Id.* at 4; Doc. 87-5 at 5 (emphasis added). There is nothing in the record indicating that, in reaching the decision to obtain an arrest warrant, Agent Vorrasi and AAG McLaughlin relied on the results

of Hurd and Jenkins' audit. For these reasons, no causation exists between Hurd and Jenkins' audit and Laskar's arrest.

### D. The validity of the arrest warrant in this case is immaterial because Laskar's detainment was brief.

In a malicious prosecution claim, in addition to proving that "'the legal process justifying his seizure was constitutionally infirm,'" the plaintiff must also prove that "'his seizure would not otherwise be justified without legal process.'" *Laskar*, 972 F.3d at 1278. This means that in cases where the plaintiff was detained for a brief period, the "validity of the warrants [for the plaintiff's arrest] is *immaterial*," and a court is "permitted to consider all the facts known to the investigators, even if those facts were not conveyed to the judicial officer issuing the warrant." *Harris*, 102 F.4th at 1135. Here, Laskar was detained in jail for approximately seven hours, which is a brief period of detention. *Id.*; *see also Williams*, 965 F.3d at 1164 (discussing *County of Riverside v. McLaughlin*, 500 U.S. 44, 57 (1991), which prohibits detentions of more than 48 hours without a judicial determination of probable cause). The validity of the arrest warrant in this case is therefore "immaterial." As a result, Laskar cannot establish any claims against Hurd and Jenkins based on the arrest warrant

since those claims require proof that the warrant process was invalid.

## II. Alternatively, the law is not "clearly established" that Hurd and Jenkins violated the Fourth Amendment.

In any event, Hurd and Jenkins are entitled to qualified immunity because the law was not "clearly established." To satisfy the "clearly established" prong of qualified immunity, Laskar was required to "identify a case where [a defendant] acting under similar circumstances … was held to have violated the Fourth Amendment." *White v. Pauly*, 580 U.S. 73, 79 (2017). The case must be from the Supreme Court, the Eleventh Circuit, or the Supreme Court of Georgia. *Sebastian v. Ortiz*, 918 F.3d 1301, 1307 (11th Cir. 2019). The case must be close enough to have "placed the … constitutional question beyond debate." *White*, 580 U.S. at 79. In other words, the preexisting precedent must "dictate[], that is, truly compel[], the conclusion for all reasonable, similarly situated public officials that what [the defendant] was doing violated [the plaintiff's] federal rights." *Evans v. Stephens*, 407 F.3d 1272, 1282 (11th Cir. 2005) (en banc). If cases have not "staked out a bright line," then qualified immunity "almost always protects the defendant." *Oliver v. Fiorino*, 586 F.3d 898, 907 (11th Cir. 2009).

Here, there is no pre-existing precedent from this Court or the Supreme Court that "truly compels" the conclusion that Hurd and Jenkins violated the Fourth Amendment. Indeed, Laskar does not even attempt to identify such precedent in his appellate brief.

Laskar instead appears to argue that the Fourth Amendment violation in this case was "obvious." Br. at 15. But the "obvious clarity" exception applies when the government official's conduct "so obviously violates the constitution that prior case law is unnecessary." *Mercado v. City of Orlando*, 407 F.3d 1152, 1159 (11th Cir. 2005). Obvious clarity cases are a "narrow exception" that are "rare and don't arise often." *King v. Pridmore*, 961 F.3d 1135, 1146 (11th Cir. 2020). And the Supreme Court has emphasized that Fourth Amendment cases in particular are not susceptible to the obvious clarity doctrine. *District of Columbia v. Wesby*, 583 U.S. 48, 63–65 (2018). Laskar cannot attempt to overcome qualified immunity by relying on the "obvious clarity" doctrine. This Court should affirm the district court's grant of qualified immunity to Hurd and Jenkins for the alternative reason that the law does not clearly establish the alleged unlawfulness of their conduct.

## CONCLUSION

For the reasons set out above, this Court should affirm the judgment of the district court.

Respectfully submitted.

/s/ *Ellen Cusimano*
Christopher M. Carr
*Attorney General of Georgia*
Loretta L. Pinkston-Pope
*Deputy Attorney General*
William W. Peters
*Senior Asst. Attorney General*
Ellen Cusimano
*Senior Asst. Attorney General*
Office of the Georgia
Attorney General
40 Capitol Square, SW
Atlanta, Georgia 30334
(404) 458-3597
ecusimano@law.ga.gov
*Counsel for Appellees*

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limitation of Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure because it contains 8,881 words as counted by the word-processing system used to prepare the document.

/s/ *Ellen Cusimano*
Ellen Cusimano

## CERTIFICATE OF SERVICE

I certify that on October 10, 2025, I served this brief by electronically filing it with this Court's ECF system, which constitutes service on all attorneys who have appeared in this case and are registered to use the ECF system.

/s/ *Ellen Cusimano*
Ellen Cusimano